**WALL PRODUCTS CO. et al., Plaintiffs,**

v.

**NATIONAL GYPSUM CO. et al., Defendants.**

Civ. Nos. 46414, 46455, 46487, 47197, 48550, 48780–48782, 48787, 48789 *and* 48797.

United States District Court,
N. D. California.

April 13, 1973.

As Modified June 6, 1973.

Frederick P. Furth, John H. Boone, San Francisco, Cal., Robert H. Weir, San Jose, Cal., for plaintiffs.

Gibson, Dunn & Crutcher, John J. Hanson, Joe Wade, Los Angeles, Cal., for National Gypsum Co.

McCutchen, Doyle, Brown & Enersen, Morris M. Doyle, Frederic A. Sawyer, Douglas B. Schwab, San Francisco, Cal., for U. S. Gypsum Co.

Thelen, Marrin, Johnson & Bridges, Gordon Johnson, Frank D. MacDowell, Michael B. Anderson, San Francisco, Cal., for Kaiser Gypsum Co., Inc.

## MEMORANDUM OPINION AND ORDER

ZIRPOLI, District Judge.

The above number 11 civil actions are the remainder of 24 private antitrust suits instituted by six (actually seven, since Wall Products Co. and Ranier Enterprises, Inc. are treated as a single dealer) "dealers" of gypsum wallboard against the major wallboard manufacturers, who conspired to establish and maintain prices of gypsum wallboard in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. For convenience of disposition, these cases were consolidated for discovery and trial purposes and separate trials were ordered on the issues of liability and damages. The liability issue was tried first and the three major manufacturers, United States Gypsum Company ("USG"), National Gypsum Company ("National"), and Kaiser Gypsum Company ("Kaiser"), were found liable and in violation of Section 1 of the Sherman Act.

In this, the trial on the damages issue, Kaiser was severed from the trial and plaintiffs, except Klamath Lumber Company of San Carlos, have now settled and dismissed all actions in which Kaiser was named as a party defendant.[1]

The plaintiffs in these. actions are Wall Products Co. ("Wall Products"), Ranier Enterprises, Inc. ("Ranier"), Cover-All Building Materials, Inc. ("Cover-All"), Di-Wal Building Materials, Inc. ("Di-Wal"), E & M Supply Company ("E & M Supply"), California Supply Company of San Jose, Inc. ("Cal-Supply"), and Klamath Lumber Company of San Carlos ("Klamath"). Cal-Supply was adjudicated bankrupt on December 30, 1966, and plaintiff John Azlant is the duly appointed trustee of the bankrupt estate. For purposes of convenience the trustee's interest will be treated under the name Cal-Supply and Wall Products and Ranier will be treated as a single plaintiff under the name Wall Products.

The liability phase of the trial, which is reported in Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295 (N. D.Cal.1971), describes the parties plaintiff and defendant in greater detail, the

---

1. Kaiser has tendered $60,000 to all plaintiffs in settlement of plaintiffs' claims against Kaiser, and the parties to the settlement have agreed that from this total sum there shall be allocated to each plaintiff an amount equal to the percentage that each plaintiff's recovery herein bears to the total recovery of all plaintiffs. The amounts received by plaintiffs shall constitute offsets against the amounts recovered by them in the judgments hereinafter ordered.
Klamath has not, as of the date of this order, accepted the settlement offer of Kaiser. Hence cases Nos. 48782 AJZ and 48789 AJZ shall remain open only as to Kaiser for such further proceedings as may be appropriate.

products involved, the structure of and performance in the industry, the pricing practices of the parties and the nature, extent and duration of the defendants' conspiratorial price fixing conduct.

The facts found and the findings made by the court in that phase of the trial will not now be repeated, but shall be deemed to be incorporated herein as though fully set forth.[2]

Following the entry of partial summary judgment establishing a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and impact upon plaintiffs, commencing December 13, 1971, a further trial was had for the purpose of determining the damages sustained by each plaintiff as a result of the conspiratorial conduct of the defendants.

On the liability issue, the court found that "there was direct impact on plaintiffs, each of whom suffered damages to their respective businesses and properties in *an as yet undetermined amount*." (Emphasis added.)

The legal basis for plaintiffs' claims for damages is Section 4 of the Clayton Act, which provides, among other things:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover damages threefold the damages by him sustained . . . 15 U.S.C. § 15.

Though impact was found from the evidence in the trial of the liability issue and in the trial of the damages issue, the court recognizes that before it can "make a just and reasonable estimate of the damages based [upon] relevant data, and render its verdict accordingly," Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946), plaintiffs must establish the existence of some causal connection between the defendants' unlawful acts and plaintiffs' injuries.

With this responsibility in mind the court now reviews the damages claims of plaintiffs. These are:

(1) lost profits equal to the difference between the prices they paid in 1966 and 1967 for gypsum wallboard and the lower prices they claim would have existed but for the conspiracy;

(2) the value of their businesses, which allegedly were lost when they were put out of business by the withdrawal of extended credit terms; and

2. On the liability issue, the court concluded in part:

4. That during the period from December 15, 1965 until January 1, 1968, USG, National and Kaiser combined and conspired among themselves and with others, to stabilize and maintain the price level of gypsum wallboard through a course of interdependent conscious parallel action pursuant to a tacit understanding by acquiescence coupled with assistance whereby they mutually agreed to, and did in fact, effective December 15, 1965, withdraw all deviations from list or published prices of gypsum wallboard, ignore the competition of single plant producers and centralize all pricing authority in the Chief Executive Officer, and whereby, effective March 1, 1966, they mutually agreed to, and did in fact, withdraw extended terms of credit (extended cash discount terms) from all buyers of gypsum wallboard;

5. That the combination and conspiracy described in conclusion 4 hereinabove continued in full force and effect from December 15, 1965 to January 1, 1968;

6. That in effectuating the combination and conspiracy described in conclusion 4 hereinabove the defendants did in substantial measure succeed in stabilizing the price of gypsum wallboard, particularly during the year 1966;

7. That the combination and conspiracy described in conclusion 4 hereinabove constituted an unreasonable restraint of interstate trade and commerce in gypsum wallboard in violation of Section 1 of the Sherman Act, 15 U.S.C. Sec. 1;

8. That as a proximate result of the violation described in conclusions 4 through 6 hereinabove, there was direct impact upon the plaintiffs, each of whom suffered damage to their respective businesses and property in an as yet undetermined amount.
326 F.Supp. at 328.

(3) the amount of their accounts receivable, which they claim could not be collected because of the withdrawal of extended terms.

To establish these claims plaintiffs have the burden of proving that the cause of injury giving rise to each of these claims was, in fact, the unlawful conduct of defendants.

■ The requirement of causation is well stated in Haverhill Gazette Co. v. Union Leader Corp., 333 F.2d 798, 802 n. 4 (1st Cir. 1964), as follows:

Private antitrust actions are not founded upon a showing of unlawful conduct only, but upon injuries, to the protected interest, which are the legal result of the overt illegal acts.

See also Gray v. Shell Oil Co., 469 F.2d 742 (9th Cir. 1972).

Of the three above enumerated claims, for the reasons hereinafter stated, only the first can be said to be the result of defendants' "overt illegal acts."

*The Competitive Price*

While the court found the conspiracy to be national in scope, for the purposes of determining the applicable competitive or normal market price of gypsum wallboard in these specific cases, the court must look to the marketing practices of the parties in the relevant market, which in this instance is Northern California. The propriety of so doing is amply supported by the evidence and is reflected by such facts as (1) the geographical marketing zones employed by defendants; (2) the references of responsible officers of defendant corporations to the California market (*e. g.*, the reference of President Harper of Kaiser to the marketing area of USG, Blue Diamond, Pabco and his company as California, particularly as it relates to marketing practices of the single plant producers, American, Republic and Texas); and (3) the memorandum prepared for top management of USG by Mr. D. W.

Wright, its Director of Market Research, on September 30, 1965, wherein he stated in part:

In the case of the other 6 producers [major producers], we should have a policy of being competitive except that it would seem that this should be *administered differently in different geographic areas.* (Emphasis added.)

Other specific references of defendants to Northern California (16 San Francisco Bay Area counties) as a relevant market are their references to the "price decline in the Bay Area due to local conditions," to the entry of Georgia-Pacific as a "new marketer" of wallboard in the "San Francisco Bay Area market," and the plant locations of defendants in "major markets."

■ A review of the pricing practices of the defendants in Northern California conclusively establishes that prices for gypsum wallboard were fixed by the defendants and paid by the plaintiffs at a substantially higher level than would have been the competitive price, in the absence of the price fixing conspiracy, and that plaintiffs were damaged as a result. A determination of what that differential was and the extent to which it may be attributed to defendants' illegal conspiracy, as contrasted to the extent that such differential, or some part thereof, may be attributed to economic factors unrelated to the conspiracy, carries with it certain difficulties. These difficulties, however, are not insurmountable.

Four factors, among others, that give rise to these difficulties are:

(1) the very nature of the gypsum wallboard industry, which Mr. Wright of USG in the aforementioned memorandum of September 30, 1965, describes as one where "the price may fluctuate within a very wide range depending upon pricing strategy and leadership within the industry";

(2) the extreme positions taken by plaintiffs and defendants as to what the

price of gypsum wallboard would have been during the relevant period absent the conspiracy;

(3) the extent to which, if any, the evidence will support a passing-on defense within the limitations set forth in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); and

(4) the inconclusive character of much of the evidence constituting the voluminous record made in the 35 days of trial on the damages issue.

In considering these difficulties it must be remembered that the wrongdoer may not object to the plaintiffs' just and reasonable estimate of the amount of damages supported by relevant data, because it is not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.

Here, despite these difficulties and the extreme positions taken by the parties, enough relevant data emerges from the evidence from which the court can and does make "a just and reasonable estimate" of the damages suffered by each plaintiff.

Defendants contend that the price differential between what plaintiffs paid per thousand square feet (MSF) of gypsum wallboard and what they would have paid therefor absent the conspiracy is: (a) zero, or (b) $1.00 per MSF, or (c) about $2.00 per MSF.

Plaintiffs contend that the differential should be at least $20.00 per MSF on all wallboard, or that the price on ½" wallboard during the conspiracy should have been $34.00 per MSF and that the price on ⅝" wallboard during the conspiracy should have been $52.25 per MSF.

Defendants' contention that the price differential is zero is based upon the opinion of their expert, Dr. Crutchfield, that price deviations (exceptions to list price) would not have gone on for more than a few months. This opinion is pure speculation and is rejected by the court. It runs counter to all the economic data established in this case and counter to the conclusions of the top executive officers of USG, including its President, Mr. Morgan. At a meeting in October of 1965 top management considered a memorandum on pricing strategy which provided in part:

Whereas we had hoped that the projected December results would represent stability and from here new strategy for restoration could be evolved and implemented early in 1966, we are now of the opinion that *the projected level does not represent true bottom, and deterioration will continue at only a slightly modified pace unless a dramatic change in strategy is made soon.* (Emphasis added.)

After considering the memorandum the only change made was when Mr. Morgan struck out the words "at only a modified pace," leaving as top management's considered opinion "that the projected level does not represent the bottom and deterioration will continue unless a dramatic change in strategy is made soon." *That dramatic change was the conspiracy.* And, once that dramatic change terminated, within less than a year (August, 1968) there was a dramatic "deterioration" in price.

The $1.00 per MSF differential estimate is based upon defendants' claim that it was the differential prevailing in the nationwide market. Yet, as discussed above, there were many marketing zones or submarkets, and the market for the purposes of these cases is Northern California. The competitive activities of defendants in this market, which was a strong "dealers'" market, were substantially unlike those in any other market of the nation. It is to the Northern California market that the court turns in its determination of damages.

The $2.00 per MSF differential estimate is based upon defendants' claim that the maximum deviation granted any plaintiff prior to December 15, 1965, was $2.00 per MSF. But this price deviation only tells a part of the story. As Mr. Harper, President of Kaiser, testified, the price deviations, exceptions to list price, had a snowball effect which defendants realized and wanted to prevent and which, as indicated in the above quoted memorandum, they did stop by the conspiracy. The desire to stop this deterioration in price is further reflected in the aforementioned memorandum of Mr. Wright of September 30, 1965, wherein he stated in part:

> In a situation where a product is not sensitive to price, the price may fluctuate within a very wide range depending upon pricing strategy and leadership within the industry. The range is limited on the high side by the price at which other firms are attracted into the industry. The ideal price, for a commodity type product such as gypsum, would be just under the level which will attract new competition. On the low side, the price is limited at the point where the return on investment is very low or nonexistent. *The width of this range in our industry probably is quite large, running from a possible low of $25 per thousand feet on gypsum wallboard to a high of somewhere in the low or mid-forties.* . . . When industry capacity is added and the redistribution of volume and ultimate lower plant utilization is achieved through severe price competition, the result is lower plant utilization *and in addition drastically reduced prices and profits.* (Emphasis added.)

By early October USG's management recognized that unless something was done USG would suffer such further dramatic price deterioration and that it would incur a loss in gross profits in 1966 calculated to be $18,000,000 below 1965 and $29,000,000 below 1964. As has been established, the question of doing "something" was answered at least by USG, National and Kaiser through an illegal conspiracy to fix prices and stem the precipitous decline in prices. To stem, in the words of Mr. Harper of Kaiser, "the snowball effect" of price deviations.

The foregoing makes it quite evident that defendants' claim that the price deviations would not have exceeded the $2.00 per MSF that existed before December 15, 1965, is wholly without merit. The evidence runs directly counter to Dr. Crutchfield's opinion that the deviations from list price would not have continued for more than a few months.

For the above stated reasons the court rejects the measures of damages suggested by defendants.

The first claim of plaintiffs that the price differential that they suffered because of the conspiracy is at least $20.00 per MSF for all wallboard is based upon Mr. Wright's opinion that unless there was a change in pricing strategy the deterioration in price would be "a possible low of $25," and on their study and analysis of production costs (mill net costs) at certain plants of the defendants. While this approach and the data in support thereof has its attractions, it is somewhat speculative and not as true a reflection of the differential as that shown by actual market performance of which we have specific relevant proof.

Performance in the market brings us to plaintiffs' alternative claim that but for the conspiracy the price they would have paid for ½″ wallboard would have been $34.00 per MSF and that for ⅝″ wallboard it would have been $52.25 per MSF. This claim is supported by substantial relevant data. Immediately prior to the conspiracy prices were dropping precipitously and the level to which they would have dropped in 1966 and 1967 but for the conspiracy is evidenced by the low level reached for defendants' wallboard prices within less than a year after the termination of the conspiracy (August, 1968).

Prior to December 15, 1965, the prices of defendants' ½″ wallboard was $45.75 per MSF with most of the plaintiffs' purchases at $43.75 (list price minus $2.00) per MSF. After the inception of the conspiracy the prices paid by plaintiffs for ½″ wallboard went to $45.75, then to $47.00, and then to $49.00 per MSF. In August, 1968, eight months after the dissipation of the conspiracy, the prices for ½″ wallboard had dropped from $49.25 rail delivery and $49.25 truck delivery to $36.00 rail list price ($34.00 for deliveries consisting of 120,000 lb. car lots) and to $36.00 truck list price. Also, within eight months after the dissipation of the conspiracy the prices of ⅝″ wallboard dropped from $71.50 rail list prices and $71.50 truck list price to $57.00 rail list price ($52.25 for deliveries consisting of 120,000 lb. car lots) and $57.00 truck list price.

From this dramatic evidence of the August, 1968, prices, it is just and reasonable to infer that a competitive or normal price of $36.00 per MSF for ½″ wallboard and a competitive or normal price of $57.00 per MSF for ⅝″ wallboard would have prevailed in 1966 and 1967, the period of the conspiracy. The court utilizes the figure $36.00 per MSF for ½″ wallboard and the figure $57.00 per MSF for ⅝″ wallboard, because these figures represent normal rail prices, whereas the $34.00 and $52.25 figures represent sales of car lots of 120,000 lbs. or more, which were the exception rather than the rule. The use of such measure of damages was employed in Ohio Valley Elec. Corp. v. General Elec. Co., 244 F.Supp. 914, 935–938 (S.D.N.Y.1965), where the measure of overcharge was "the large gap between [the] order and book prices after the conspiracy was uncovered as contrasted with the small gap which previously existed," 244 F.Supp. at 935.

Other economic data confirming the use of the $36.00 figure for ½″ wallboard and the $57.00 figure for ⅝″ wallboard as just and reasonable indications of what the price for such wallboard would have been in 1966 and 1967 consists of the following:

(1) production cost data of defendants, from which one could reasonably infer that the competitive prices indicated by the 1968 level could have been, and in all probability would have been, substantially lower in the short 1966–1967 period in question;

(2) price data for 1969 and 1970, which show that the low prices in 1968 were sustained for a substantial period of time and were in fact even lower in 1970 than in 1968;

(3) industry capacity utilization statistics, which show that the percent of industry capacity utilization was lower in 1966 and 1967 than it was in 1968–1970, thereby indicating that the incentive to cut prices was actually greater in 1966 and 1967 than it was in 1968;

(4) statistics of construction activity, which show that the demand for gypsum wallboard was greater in 1968 and 1969 than in 1966 and 1967;

(5) construction cost indexes, which show that, in general, construction prices were higher in 1969–1970 than in 1966–1967; and

(6) a comparison of freight rates, which show that delivery by truck costs more than by rail (thus, a $36.00 truck delivery price should be the equivalent of a $34.00 rail delivery price).

The conclusion to be drawn from all this relevant data is that absent the conspiratorial actions of the defendants the 1965 price decline would have resulted in a price of $36.00 (or less) per MSF for ½″ wallboard and $57.00 (or less) per MSF for ⅝″ wallboard.

The court finds no merit in the defendants' rebuttal. It considered and, as stated above, rejected as pure speculation Dr. Crutchfield's "belief" that if the conspirators had only refrained from their illegal conspiracy, the prices would have been restored without illegal tampering. The court also rejects defendants' contention that the precipitous

drop in prices in 1968 was the result of changes in marketing practices unrelated to the conspiracy. These changes, which came after dissipation of the conspiracy, resulted from Georgia Pacific Corporation's emergence as a strong competitor employing new marketing techniques (direct sales from warehouses) and the establishment by USG (announced in December, 1967) of a "Supply Division" in the San Francisco Bay Area market, thereby enabling it to sell as a "dealer."

USG had suffered a decline in its share of the Bay Area market from 40 percent thereof in 1963 to 12 percent by 1968. It set up its "Supply Division" in the expectation that it would thereby stem the decline in its share of this market, substantially engendered by the competitive marketing activities of Georgia Pacific, and restore some of this lost share of the market. In so doing it was prepared to and did assume the "dealer" responsibilities and costs theretofore borne by independent dealers such as plaintiffs. It is reasonable to infer that if USG could sell directly from its warehouses to the consumers (contractors, etc.) at its 1968 prices and assume what otherwise would have been "dealer" costs, it should have been able to sell at even less to dealers during the years 1966 and 1967. *Moreover, the court concludes that these new market approaches and distribution techniques on which defendants now rely as a defense were in fact the direct result of competition that had theretofore been stifled by the conspiracy.*

In its determination of the damages suffered by plaintiffs, the court will include not only the purchases made by plaintiffs from USG, National and Kaiser, but also those from Georgia-Pacific, Celotex, Flintkote, Fibreboard and single plant producers. The court does so because the conspiracy caused all major manufacturers to withdraw price deviations at the same time, December 15, 1965. The announcement date in 1965 of each of the major manufacturers of such withdrawal of price deviations to the extent known was as follows:

| | |
|---|---|
| USG | November 17 |
| Georgia-Pacific | November 24 |
| National | November 24 |
| Blue Diamond | November 29 |
| Flintkote | November 30 |
| Kaiser | November 30 |
| Celotex | December 1 |
| Fibreboard | December 2 |

This termination of price competition by the major manufacturers naturally resulted in a higher price level for American, Republic, Big Horn and other single plant manufacturers. As a consequence, none of the plaintiffs, after December 15, 1965, were able to receive any price lower than the prices charged by the conspirators USG, National and Kaiser.

Given these facts it is clear that the defendants are not only liable for overcharges sustained from purchases from them, but also for overcharges resulting from purchases made from non-conspirators. *See* State of Washington v. American Pipe & Construction Co., 280 F.Supp. 802, 807 (W.D.Wash. 1968). The law is also clear that USG and National as joint tortfeasors with Kaiser are jointly and severally liable for any and all damages. Northwestern Oil Co. v. Sacony-Vacuum Oil Co., Inc., 138 F.2d 967, 971 (7th Cir. 1943); City of Atlanta v. Chattanooga Foundry and Pipeworks, 127 F. 23 (6th Cir. 1903), aff'd, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). Accordingly, USG and National, and each of them separately, are liable for all damages sustained by plaintiffs.

With the evidence of transactions of plaintiffs (purchases by plaintiffs of gypsum wallboard from defendants and other manufacturers in MSF and dollar amounts) and the competitive or normal price which would have prevailed during the period 1966 and 1967, it is a fairly simple matter to determine the overcharge paid by each plaintiff. The evidence indicates that the normal or com-

petitive price for ½″ regular wallboard in Northern California during 1966–1967 would have been $36.00 per MSF and for ⅝″ fire rated wallboard the normal or competitive price would have been $57.00 per MSF. Accordingly, the overcharge damage sustained by each plaintiff was as follows:

DI–WAL

| *Purchases* | MSF | x | Normal Price | = | Normal $ | Actual $ | Damage (Actual $– Normal $) |
|---|---|---|---|---|---|---|---|
| ½″ from defendants | 18,018 | | $36 | | 648,648 | 840,222 | $191,574 |
| ½″ from other manufacturers | 8,053 | | $36 | | 289,908 | 375,840 | $ 85,932 |
| ⅝″ from defendants | 6,719 | | $57 | | 382,983 | 469,467 | $ 86,484 |
| ⅝″ from other manufacturers | 2,687 | | $57 | | 153,159 | 187,747 | $ 34,588 |
| Total MSF | 35,477 | | | | | | |
| | | | | | | Total Overcharge | $398,578 |

COVER–ALL

| *Purchases* | MSF | x | Normal Price | = | Normal $ | Actual $ | Damage (Actual $– Normal $) |
|---|---|---|---|---|---|---|---|
| ½″ from defendants | 3,980 | | $36 | | 143,280 | 184,476 | $ 41,196 |
| ½″ from other manufacturers | 118 | | $36 | | 4,248 | 5,550 | $ 1,302 |
| ⅝″ from defendants | 3,829 | | $57 | | 218,253 | 267,073 | $ 48,820 |
| ⅝″ from other manufacturers | 8 | | $57 | | 456 | 578 | $ 122 |
| Total MSF | 7,935 | | | | | | |
| | | | | | | Total Overcharge | $ 91,440 |

WALL PRODUCTS–RANIER

| *Purchases* | MSF | x | Normal Price | = | Normal $ | Actual $ | Damage (Actual $– Normal $) |
|---|---|---|---|---|---|---|---|
| ½″ from defendants | 6,067 | | $36 | | 218,412 | 279,624 | $ 61,212 |
| ½″ from other manufacturers | 10,100 | | $36 | | 363,600 | 469,310 | $105,710 |
| ⅝″ from defendants | 2,782 | | $57 | | 158,574 | 196,416 | $ 37,842 |
| ⅝″ from other manufacturers | 2,183 | | $57 | | 124,431 | 152,319 | $ 27,888 |
| Total MSF | 21,132 | | | | | | |
| | | | | | | Total Overcharge | $232,652 |

Based upon an exhibit introduced by USG (US 90), the allocation of wallboard between Wall Products and Ranier was 72.71 percent for Wall Products and

27.29 percent for Rainer. Accordingly, the above damages should be allocated between them, if necessary, in the same ratio.

### CALIFORNIA–SUPPLY

| Purchases | MSF | x | Normal Price | = | Normal $ | Actual $ | Damage (Actual $– Normal $) |
|---|---|---|---|---|---|---|---|
| ½″ from defendants | 4,933 | | $36 | | 177,588 | 226,657 | $ 49,069 |
| ½″ from other manufacturers | 7,545 | | $36 | | 271,620 | 347,149 | $ 75,529 |
| ⅝″ from defendants | 1,376 | | $57 | | 78,432 | 95,771 | $ 17,339 |
| ⅝″ from other manufacturers | 1,231 | | $57 | | 70,167 | 85,763 | $ 15,596 |
| Total MSF | 15,085 | | | | | Total Overcharge | $157,533 |

### E & M SUPPLY

| Purchases | MSF | x | Normal Price | = | Normal $ | Actual $ | Damage (Actual $– Normal $) |
|---|---|---|---|---|---|---|---|
| ½″ from defendants | 1,432 | | $36 | | 51,552 | 66,818 | $ 15,266 |
| ½″ from other manufacturers | 6,917 | | $36 | | 249,012 | 322,592 | $ 73,580 |
| ⅝″ from defendants | 2,038 | | $57 | | 116,166 | 142,490 | $ 26,324 |
| ⅝″ from other manufacturers | 2,267 | | $57 | | 129,219 | 158,200 | $ 28,981 |
| Total MSF | 12,654 | | | | | Total Overcharge | $144,151 |

### KLAMATH

| Purchases | MSF | x | Normal Price | = | Normal $ | Actual $ | Damage (Actual $– Normal $) |
|---|---|---|---|---|---|---|---|
| ½″ from other manufacturers | 2,399 | | $36 | | 86,364 | 111,572 | $ 25,208 |
| ⅝″ from other manufacturers | 601 | | $57 | | 34,257 | 41,929 | $ 7,672 |
| Total MSF | 3,000 | | | | | Total Overcharge | $ 32,880 |

When trebled, each plaintiff is entitled to recover damages from defendants USG and National, jointly and severally, as follows:

| | | |
|---|---|---|
| Di–Wal | $398,578 x 3 | $1,195,734 |
| Cover–All | 91,440 x 3 | 274,320 |
| Wall Products/Ranier | 232,652 x 3 | 697,956 |
| Cal–Supply | 157,533 x 3 | 472,599 |
| E & M Supply | 144,151 x 3 | 432,453 |
| Klamath | 32,880 x 3 | 98,640 |
| Total Recovery for all Plaintiffs | | $3,171,702 |

### Pass-On Defense

■ All that the defendants have proved by their voluminous pass-on exhibits is that there was a substantial difference between the manufacturers' price changes and plaintiffs' price changes during the first year of the conspiracy. Such evidence comes nowhere near to satisfying the rigorous requirements of a valid pass-on defense outlined in Hanover Shoe, Inc. v. United

Shoe Mach. Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Defendants pass-on evidence is especially deficient in that it fails to make a "convincing showing" that plaintiffs' conspiracy-period increases would not have occurred absent defendants' illegal price increases. In point of fact, defendants' pass-on analysis indicates the exact opposite conclusion in the case of each plaintiff.

There is no evidence in the record that plaintiffs resold the wallboard that they purchased from defendants and other manufacturers pursuant to pre-existing cost-plus contracts with their own customers. The court therefore cannot conclude that plaintiffs come within this single explicit exception to *Hanover's* general rejection of the pass-on defense in antitrust cases involving direct-purchaser plaintiffs.

Neither can the court find, on the basis of defendants' pass-on evidence, that plaintiffs' pricing methods were "the equivalent" of cost-plus arrangements, thereby bringing plaintiffs within some area of implicit exception to the *Hanover* rule, assuming such an area exists. Defendants place heavy reliance on West Virginia v. Chas. Pfizer & Co., 314 F. Supp. 710 (S.D.N.Y.1970), aff'd 440 F. 2d 1079 (2d Cir. 1971).

In the *Pfizer* case, involving a number of consolidated antitrust actions in which nationwide classes of plaintiffs charged price-fixing by the defendant manufacturers of antibiotic drugs, Judge Inzer Wyatt approved a proposed plan of allocation of a 100 million dollar settlement fund. Under the proposed plan, only slightly more than three percent of the fund was earmarked for the class of wholesalers and retailers of antibiotic drugs, with the bulk of the fund going to various public entities and other end-user plaintiffs.

Allocation of such a small portion of the fund to wholesalers and retailers was reasonable, the court determined, in light of circumstances tending to show that these middlemen computed their own resale prices in such a way that any overcharges would automatically have been passed on to their customers. With respect to the wholesalers, it was noted that they invariably resold antibiotic drugs purchased from the defendants at a "mark-up" of at least 16⅔ percent over cost. Similarly, the retailers (pharmacists) sold either at cost plus a flat professional fee, or at a mark-up of 66⅔ percent over cost. "The result," the court said, "is that wholesalers and retailers, far from sustaining damages, made substantial profits from any antitrust violations." 314 F.Supp. at 745.

Judge Wyatt did not expressly rule against the contention of the wholesalers and retailers that under *Hanover* they were entitled to recover any illegal charges as a matter of law. But the court did conclude that due to the close similarity between cost-plus arrangements and the fixed percentage mark-up system used by the druggists, "it is very doubtful, to say the least, that *Hanover* would apply to the situation here." 314 F.Supp. at 745.

There is a very fundamental difference between the pricing practices of the wholesaler-retailer plaintiffs in *Pfizer* and those of the wallboard dealer plaintiffs here. The members of the wholesaler-retailer class in *Pfizer* computed their selling prices by adding a certain fixed percentage mark-up or flat professional fee to the price they paid to the manufacturers of the antibiotic drugs. Under such a system, it was inevitable and easily demonstrable that the entire amount of any overcharge would be passed on by the wholesaler-retailer to their own customer. In the instant case, by contrast, there is no evidence that any of the six dealer plaintiffs ever computed their selling prices by adding to the manufacturers' price a fixed percentage of that price as a mark-up. The very most the defendants have shown is that certain plaintiffs at certain times endeavored to maintain a *gross profit percentage for their business as a whole*. As one specific means to this general

end, *some* plaintiffs *sometimes* raised their resale price in *some* amount in response to the manufacturers' price increases. But this is far from the precise "percentage of cost" mark-up system involved in the drug cases. The pricing system of the plaintiffs here does not—as the system of the drug wholesalers and retailers did—eliminate the many insurmountable problems of proof that led the Supreme Court to announce its general rule rejecting the pass-on defense.

In view of this major difference between the pricing systems of the wholesaler-retailer plaintiffs in *Pfizer* and those of plaintiffs here, it is clear that *Pfizer* is distinguishable from the instant cases and lends no support to defendants' pass-on claim. Also in view of this major difference, the surface similarities between the wholesaler-retailer druggists and the gypsum dealers (i. e., both resold the product in the same form they purchased it but plaintiffs added service to the product; both were only one class of plaintiffs in cases involving other plaintiffs at lower levels of the distribution line) become inconsequential.

■ The overall conclusion is plain: defendants' assertion of the pass-on defense in the instant cases is contrary to controlling legal principles, is unsupported by the evidence in the record, and is therefore rejected by the court. Plaintiffs are entitled to recover overcharge damages in the amount of the entire difference between the sums they actually paid for gypsum wallboard during the conspiracy period, and the sum they would have paid absent defendants' conspiracy, and they are entitled to have such damages trebled as provided by law.

*Plaintiffs' Other Claims*

Plaintiffs' second and third claims, stated at the outset in this memorandum opinion, are that they lost their businesses and were unable to collect substantial accounts receivable because of the withdrawal of credit terms by USG, National and Kaiser announced during the period February 1 through February 16, 1966, and made effective March 1, 1966.

■ Plaintiffs have wholly failed to satisfy their burden of proving that these losses were the proximate result of defendants' illegal activities. Plaintiffs are asking the court to divine such causative facts when in fact the record on these claims establishes that plaintiffs lost their businesses and were unable to collect their accounts receivable (and it is questionable that they diligently pursued these accounts) because of their lack of working capital; their mismanagement and inability to operate at a profit considering the nature and extent of their risk; their choice of uncreditworthy customers, which resulted in an unacceptable and intolerable credit exposure; their hopeless financial condition by the end of 1965; and a decline in the building industry in 1965 and 1966. These were the real causes of plaintiffs' failures and they are not attributable to any conspiratorial conduct of the defendants.

In the context of this case extended credit terms meant two things: (1) additional time within which to pay for purchases and still earn cash discount, and (2) additional time within which to pay before becoming past due. Plaintiffs have failed to prove that they lost cash discounts which they otherwise could have earned or that they lost working capital as the result of the contraction of credit extended to them. With the exception of Di-Wal there is a total failure to prove that plaintiffs were earning a cash discount prior to March 1, 1966, which was taken from them thereafter. In the case of Di-Wal there is some evidence that cash discounts were earned prior to March 1, 1966, and continued until January 1, 1967, when Di-Wal *voluntarily* ceased doing business. There is insufficient evidence from which the court could conclude that Di-Wal ceased doing business because of any conspiratorial conduct of

the defendants, and there is some indication in the record that it may have done so to serve the purposes of this very litigation.

Regarding the availability of working capital, it should be further noted that defendants continued to carry notes and substantial past due amounts on open book accounts for plaintiffs after the withdrawal of extended credits *and in most cases the amount of credit extended to the plaintiffs actually increased after the "withdrawal" of extended terms.*

Considering the precarious financial position of plaintiffs by the end of 1965 and the enormous amounts they owed the manufacturers (all past due from as many as 2 months to 8.8 months as of December 31, 1965), it is clear that the defendants would have or should have withdrawn by early 1966 the extended terms previously granted to plaintiffs, even in the absence of any claimed conspiracy. Furthermore, the record reflects that plaintiffs were never deprived of extended credit for working capital as a result of the withdrawal of extended terms effective March 1, 1966. Only the form changed and each defendant made available varying programs to assist dealers with respect to payments following the announced withdrawal of extended credit terms.

Proof of loss of business (termination thereof) and proof of loss of receivables must be "real proof" and not mere "speculation," and it must be such that it points to the conspiratorial conduct of the defendants as the proximate cause thereof. This is the burden that rests squarely with plaintiffs. This burden as to these two claims plaintiffs have totally failed to sustain.

*Conclusion*

From all of the foregoing the court concludes and orders that judgments be entered in favor of plaintiffs and against defendants United States Gypsum Company and National Gypsum Company in the manner hereinafter stated and in the amounts set forth in each of the hereinafter entitled and numbered cases:

*Civil Nos. 46414 AJZ and 48550 AJZ*

In consolidated cases Civil No. 46414 AJZ, entitled "Wall Products Company v. National Gypsum Company," and Civil No. 48550 AJZ, entitled "Wall Products Company/Ranier Enterprises, Inc. v. United States Gypsum Company," it is ordered that plaintiff Wall Products Company recover from National Gypsum Company and United States Gypsum Company, jointly and severally, the sum of $507,484.00, with interest thereon from the date of entry of judgment, and costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15, and that plaintiff Ranier Enterprises, Inc. recover from United States Gypsum Company the sum of $190,472.00, with interest thereon from the date of entry of judgment, and costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15.

The consolidated judgment heretofore entered on April 16, 1973 in the consolidated cases Civil Nos. 46414 AJZ and 48550 AJZ is hereby vacated and a revised judgment in Civil Nos. 46414 AJZ and 48550 AJZ as herein ordered shall be entered nunc pro tunc as of date April 16, 1973.

*Civil No. 46455 AJZ*

In Civil No. 46455 AJZ, entitled "Cover-All Building Materials, Inc. v. United States Gypsum Company," it is ordered that plaintiff recover from defendant United States Gypsum Company the sum of $274,320, with interest thereon from the date of entry of judgment, and costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15.

*Civil Nos. 46487 AJZ and 47197 AJZ*

In consolidated cases Civil No. 46487 AJZ, entitled "Di-Wal, Inc., et al. v. United States Gypsum Company," and Civil No. 47197 AJZ, entitled "Di-Wal, Inc., et al. v. National Gypsum Company," it is ordered that plaintiffs recover from defendants United States Gypsum Company and National Gypsum Company, jointly and severally, the sum of

$1,195,734, with interest thereon from the date of entry of judgment, and costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15.

*Civil Nos. 48780 AJZ and 48781 AJZ*

In consolidated cases Civil No. 48780 AJZ, entitled "John Azlant, as Trustee for the Estate of California Supply Company of San Jose, Inc., a bankrupt corporation v. United States Gypsum Company," and Civil No. 48781 AJZ, entitled "John Azlant, as Trustee for the Estate of California Supply Company of San Jose, Inc., a bankrupt corporation v. National Gypsum Company," it is ordered that plaintiff recover from defendants United States Gypsum Company and National Gypsum Company, jointly and severally, the sum of $472,599, with interest thereon from the date of entry of judgment, and costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15.

*Civil Nos. 48787 AJZ and 48797 AJZ*

In consolidated cases Civil No. 48787 AJZ, entitled "E & M Supply Company v. United States Gypsum Company," and Civil No. 48797 AJZ, entitled "E & M Supply Company v. National Gypsum Company," it is ordered that plaintiff recover from defendants United States Gypsum Company and National Gypsum Company, jointly and severally, the sum of $432,453, with interest thereon from the date of entry of judgment, and costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15.

*Civil Nos. 48782 AJZ and 48789 AJZ*

In consolidated cases Civil No. 48782 AJZ, entitled "Klamath Lumber Company of San Carlos v. National Gypsum Company," and Civil No. 48789 AJZ, entitled "Klamath Lumber Company of San Carlos v. United States Gypsum Company," it is ordered that plaintiff recover from defendants National Gypsum Company and United States Gypsum Company, jointly and severally, the sum of $98,640, with interest thereon from the date of entry of judgment, and

costs and reasonable attorneys' fees as provided by 15 U.S.C. § 15.

The judgments that the court has hereinabove ordered shall be and are final judgments under Rule 54(b) of the Federal Rules of Civil Procedure, there being no just reason for delay in entry of final judgment in these cases.

The foregoing opinion constitutes the court's findings of fact and conclusions of law as required by Federal Rules of Civil Procedure, Rule 52(a). Judgments as herein ordered shall be entered forthwith.

Attorneys for plaintiffs and defendants are directed to appear before this court at 10 o'clock a. m. on May 15, 1973, to fix costs and attorneys fees as directed by law.