UNITED STATES of America

v.

UNITED STATES GYPSUM COMPANY et al.

Crim. No. 73–347.

United States District Court,
W. D. Pennsylvania.

Oct. 21, 1974.

---

John C. Fricano, Antitrust Div., Dept. of Justice, Washington, D. C., Richard L. Thornburgh, U. S. Atty., Pittsburgh, Pa., for plaintiff.

Cloyd R. Mellott, William B. Mallin, J. Gary Kosinski, Robert J. Tate, Willis A. Siegfried, Jr., Eckert, Seamans, Cherin & Mellott, Malcolm Anderson, Emil E. Narick, Anderson, Moreland & Bush, M. Richard Dunlap, Pittsburgh, Pa., Gordon Johnson, San Francisco, Cal., John L. Doherty, Livingston & Miller, David J. Armstrong, Charles W. Kenrick, J. Tomlinson Fort, John McN. Cramer, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., W. Donald McSweeney, William A. Montgomery, Schiff, Hardin & Waite, Chicago, Ill., Alexander Unkovic, P. Christian Hague, Meyer, Unkovic & Scott, Pittsburgh, Pa., William C. Miller, James J. Walsh, Gary H. Anderson, Pillsbury, Madison & Sutro, San Francisco, Cal., W. Walter Braham, Jr., David L. McClenahan, Kirkpatrick, Lockhart, Johnson & Hutchison, Pittsburgh, Pa., Charles M. Price, Robert C. Keck, James G. Hiering, Douglass F. Rohrman, Price, Cushman, Keck, Mahin & Cate, Fred H. Bartlit, Jr., Thomas A. Gottschalk, Jeffrey S. Davidson, Kirkland & Ellis, Chicago, Ill., William C. O'Neil, William M. Wycoff, Thorp, Reed & Armstrong, Pittsburgh, Pa., H. Francis De Lone, Alfred W. Cortese, Jr., John F. Wilson, III, Dechert, Price & Rhoads, Philadelphia, Pa., William L. Rieth, David K. Floyd, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y., Paul C. Warnke, Larry L. Williams, Thomas Richard Spradlin, Clifford, Warnke, Glass, McIlwain & Finney, Washington, D. C., for defendants.

## OPINION

TEITELBAUM, District Judge.

■ From September 9, to September 13, 1974, an evidentiary hearing in the above-captioned criminal antitrust case was held before this Court. The evidentiary hearing was held at defendants' request in order to enable them to attempt to prove substantial and in-

tentional [1] pre-accusation delay on the part of the Government in support of their motion to dismiss the indictment brought against them. Having examined the evidence that they have brought forth in support of their position and having considered their legal arguments, I have concluded that defendants' motion to dismiss must be denied.

The wellspring of defendants' position is the following quotation from United States v. Marion, a recent United States Supreme Court case:

"[T]he Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." United States v. Marion, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971).

In considering the import of this quotation, it must be borne in mind: 1) that in the *Marion* case this position was conceded by the Government in its brief and 2) that neither intentional delay nor actual prejudice to the conduct of the defense were proven in that case. Prejudice was not even alleged. Moreover, Justice White, speaking for the majority in *Marion*, went on to point out, immediately following the statement quoted above:

"However, we need not and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays require the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution." *Id*. at 324, 92 S.Ct. at 465 (footnotes omitted)

■ The Court has indulged defendants in their request to hold an evidentiary hearing on the question of pre-indictment delay here because this is an important case, one with potentially grave consequences for the liberty of ten men and the legal and financial status of six large corporations, and because this Court recognizes its inherent power, springing from its Constitutional mandate to insure fairness and see that justice is done in criminal matters, to dismiss this indictment, or any other, if it were convinced that defendants' fundamental due process rights had been abrogated. But this does not mean that this Court harbors no doubt as to the viability of the legal theory under which defendants proceed or especially that this Court has a mind to setting a precedent of investigating the Government investigators in every criminal case which comes before it. I point this out because I want no misunderstanding of my motives nor any misunderstanding of what I consider to be the decidedly limited precedential value of my approach in this case. De-

---

1. Defendants urge this Court to find that a finding of actual prejudice to defendants is sufficient to warrant dismissal regardless of whether the prejudice was the result of intentional delay. Neither case cited in support of the point, however, [United States v. Parrott, 248 F.Supp. 196, 203 (D.D.C.1965) and United States v. Harmon, (D.C.J., 379 F.Supp. 1349, August 7, 1974] stands for that proposition and this Court will not so hold. The *Parrott* case examines not the *Marion* doctrine with which we are concerned here, but the doctrine of delay as a result of choice of venue contained in Petition of Provoo, 17 F.R.D. 183 (D.Md.), aff'd, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955). The *Provoo* doctrine was discussed in a previous opinion in this case, United States v. U. S. Gypsum, et al., 383 F.Supp. 462 (W.D.Pa.1974). Judge Weber held in the *Harmon* case, not that a showing of intentional delay was not necessary but that: "In the lack of any reason advanced by the government for the delay, we may infer that there was an intent by the government to secure a tactical advantage over the defendant. Such an intent can rarely be shown otherwise." (p. 1351 of 379 F. Supp.). In this case, the reasons for the Government's alleged delay in bringing the indictment are fully justified as is substantiated *infra*.

fendants' goal in the hearing was to prove both 1) intentional delay on the part of the Government, inspired by the hope of gaining improper tactical advantage over the defendants, which 2) has worked to the actual prejudice of the conduct of the defense.[2] They have failed to demonstrate either proposition.

## THE ISSUE OF INTENTIONAL DELAY

In order to provide a background for the discussion which will follow, it is necessary to provide a synopsis of the major events which preceded the return of the indictment in this case. In 1923, as a result of much litigation and negotiation between the parties, the major gypsum wallboard producing corporations in this country became signatories, along with the United States, to a consent decree on the issue of price controls within the industry. In 1928, an amendment to the 1923 consent decree was contractually agreed to by the parties and in 1951 yet another consent decree was signed.

In March of 1961, Claude Huckleberry, president of the Texas Gypsum Co., met at the behest of his Congressman with the then Attorney General of the United States, Robert Kennedy, to complain that his company had been the target of allegedly predatory price fixing practices by the major gypsum producing corporations, members of the Gypsum Association.[3] Huckleberry's apparent intention in this meeting was to seek an investigation by the Antitrust Division of the majors' activities.

Huckleberry was subsequently informed that his complaint had been referred to the Attorney General of the State of Texas for possible action under that state's antitrust laws.

In March of 1962, Texas Gypsum filed a private treble damage action against each of the companies who are defendants in this case (except Georgia-Pacific), and the American Gypsum Company, in addition. Discovery by means of deposition and interrogatories took place, but in April of 1965 the case was settled out of court, soon after the Texas Gypsum Company was acquired by another concern.

In the meantime, in August of 1964, Huckleberry had complained to the Federal Trade Commission (FTC) about alleged price fixing in the gypsum industry and had supplied that agency with documents from the Texas Gypsum case as support for his charges. In October of 1964, Huckleberry's complaints were referred to the Antitrust Division.

From late 1964 until the fall of 1966, as revealed by internal Government memoranda, the focus of FTC and Justice Department personnel was upon 1) the promulgation of trade practice rules for the gypsum industry and 2) the possibility of action against the Texas Gypsum defendants for violation of the judgments entered against them some years earlier in the District of Columbia and the Southern District of New York. No fair analysis of the Government's activity could conclude that anything like a full-scale investigation of the gypsum industry with an eye to possible

---

2. In their brief, defendants contend that a showing of *either* actual prejudice *or* intentional delay will suffice to cause the indictment to be dismisesd. Such a view is ill-founded. The two concepts are inextricably bound in the *Marion* scheme, each serving as the necessary counterpart of the other. The point hardly requires demonstration, especially since the cases cited by defendants to support their dualistic view [United States v. Erickson, 472 F.2d 505 (9th Cir. 1973); United States v. Stein, 456 F.2d 844 (2d Cir. 1971); United States v. Ianelli, 461 F. 2d 483 (2d Cir. 1972)] simply do not require, or even recommend, an either/or approach to this problem.

3. Each of the corporate defendants in this case, except Georgia Pacific, was a member of the Gypsum Association at that time. Georgia Pacific became a member of the Association in early 1965 subsequent to its acquisition of the Bestwall-Gypsum Co., at the time a leading producer of gypsum wallboard products.

criminal indictments was taking place during this period.

On March 23, 1966, Pensinger Builders Supply Co. v. Kaiser Gypsum Co., C.A.No. 5923–PHX, (D.Ariz.) was filed in Federal District Court in Phoenix, Arizona. *Pensinger* was the first drop in what was to become a torrent of private treble damage actions alleging, *inter alia,* price fixing against the major gypsum producers. The *Pensinger* case was later settled out of court. On January 25, 1967, Wall Products Co. v. National Gypsum Co., 326 F.Supp. 295 (N.D.Cal.1971); 357 F.Supp. 832 (N.D. Cal.1973), a private treble damage, action was filed in the Northern District of California. This was the first of 143 cases against the gypsum corporations which were ultimately filed in San Francisco or transferred there by the Panel on Multidistrict Litigation and assigned to District Judge Alfonso Zirpoli. The *Wall Products* litigation, having begun in January of 1967, was not ultimately concluded until midsummer of 1974 when the final order on attorney's fees was entered.

On October 25, 1966, Baddia Rashid, Deputy Director of Operations of the Antitrust Division wrote to Alan Dobey, then Chief of the Antitrust Division's Trial Section, to authorize a "full investigation of the gypsum industry" by the Division's Central Office in Washington, with the pending investigations then ongoing in the Chicago and Philadelphia offices to be consolidated. This "full investigation" was, of course, mammoth in its scope and, as a consequence, quite time-consuming. It is clear that the very nature of the investigation—with its hundreds of people to be questioned, its mountains of documents to be examined and analyzed and its inherent difficulties of orchestration—led inevitably to a four-year delay before the Assistant Attorney General was in a position to make a decision as to whether a grand jury should be empaneled. As an example, it is apparent that the investigation floundered for many months while Justice Department investigators decided whether and whether it was possible to pursue a "shared monopoly" theory against the companies as opposed to a strict conspiracy theory.[4] In general, it is clear that the inherently cumbersome nature of the investigation serves to explain whatever delay occurred at this initial stage. Little else is even suggested by defendants.

On December 23, 1969, Robert B. Hummel, Rashid's successor as Deputy Director of Operations, made his report to the office of the then Assistant Attorney General, Richard McLaren. Hummel's report was the culmination of the appraisals and recommendations of the Central and San Francisco office investigations, wherein the pros and cons of grand jury action had been candidly weighed and debated. Hummel urged that a grand jury not be empaneled for two reasons: 1) an indictment was not warranted in *Container* type cases "particularly so close upon the Supreme Court decision,"[5] and 2)

4. Although its primary importance lies in the fact that it turned out to be nothing more than a time-consuming dead end, the fruitless pursuit of a "shared monopoly" case against the gypsum companies is also significant because it is susceptible to the interpretation that the investigation's purpose was to develop evidence for a civil action, not a criminal conspiracy case. Thus, if that inference were carried to its logical conclusion, it could be said that there was no investigation, in the sense that defendants complain of one, until at least 1970.

5. The reference is to United States v. Container Corp of America, 393 U.S. 333, 89

S.Ct. 510, 21 L.Ed.2d 526 (1969), handed down in January of 1969. In *Container* the reciprocal exchange of price information between competitors as to specific sales to identified customers was held to constitute illegal price fixing, regardless of the intent of the competitors. In the *Wall Products* case, *supra,* Judge Zirpoli held that Cement Manufacturers' Protective Association v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925), constituted an exception to the *Container* doctrine and that good faith adherence to the Robinson-Patman Act, as well as the "lying buyer" defense of *Cement Manufacturers,* was sufficient to render *Container*

the public interest was being adequately represented in the private treble damage actions.[6] McLaren personally noted Hummel's memorandum "O.K. to close 1/14/70."

Six months later, however, in July of 1970, the FTC began its own investigation of gypsum pricing policies. Spurred on by developments brought to light by the FTC, Justice reopened its investigation in October of 1970. Attached to the memorandum ordering reopening is a buckslip from Hummel to the Assistant Chief of the Antitrust Division Judgment Section stating: "Suggest you wait for decision of Judge Zirpoli in west coast case before framing any charges." Defendants point to this statement as evidence of the Government's alleged policy of obfuscation and delay, calculated to prejudice the defendants. I do not find it to be such; indeed, I would be surprised, given the enormity of the potential implications

of the west coast decision, had the Government pursued any other course. To have done so would have been, however, merely impetuous. The important point is that there is no evidence to suggest that the Government's delay was based upon anything other than the sound and circumspect policy reasoning which is incumbent upon Justice Department officials in the performance of their duties.

Judge Zirpoli rendered his *Wall Products* liability decision (326 F.Supp. 295) on March 18, 1971. After digesting and analyzing that opinion, John C. Fricano recommended to his superiors in the Antitrust Division on July 12, 1971 that a grand jury be empaneled to undertake a full Sherman Act Investigation of the Gypsum industry. Attorney General Mitchell approved the request in August of 1971 and a grand jury was empaneled in Pittsburgh within that month.[7]

*Corporation* inapplicable. Defendants contend that the Government stalled awaiting a decision in *Wall Products* and then, once a decision had been handed down, sought an indictment in a District other than the Northern District of California in order to avoid the effect of Judge Zirpoli's reading of *Container*. As is fully substantiated in the text, the first contention is entirely without basis in fact. The second contention ignores the fact that the *Container/Wall Products* dichotomy (what has been called the verification issue in this case) raises profound policy questions which go to the very heart of trade regulation in this country. At this stage of the proceedings, I will not demean the conduct of the Government attorneys in this case nor oversimplify the import of this complex, portentious issue by holding that the Government was motivated in any decision leading up to the indictment by so base an instinct as the evasion of one judge or one judicial district. Their motivations, as amply demonstrated in the internal Government memoranda available to defendants, were far more complex and honorable.

6. Defendants raise the novel argument that this prosecution is barred by collateral estoppel, *res judicata* and double jeopardy, ignoring the facts that 1) the *Wall Products* case and this case arise in different factual and legal contexts; while the cases are *similar*, they are in no sense the *same* as to either their facts or as to issues raised, and

2) that the Government was not a party to the *Wall Products* litigation, and 3) that the Sherman and Clayton Acts encourage *both* Government and private enforcement litigation. While it may be uncommon for criminal antitrust prosecution to follow, rather than precede, private treble damage litigation, there is no legal foundation under these circumstances for the proposition that such a sequence is impermissible. Moreover, express reliance on private attorneys generally has the salutary effect of multiplying the effectiveness of Justice Department personnel during a period when antitrust enforcement presents problems of great complexity and scope. See the remarks of Assistant Attorney General Richard McLaren before the Federal and Philadelphia Bar Associations, December 11, 1969 at p. 2.

7. Defendants suggest that some impropriety and resultant prejudice can be found in the fact that the grand jury was empaneled in Pittsburgh, rather than in San Francisco, where the *Wall Products* litigation was taking place. Notwithstanding the fact that this Court's June 18, 1974 Opinion on defendants' motion to sever and transfer was thought to have disposed of all venue questions in this litigation, I find no impropriety or evidence of intentional delay in the Justice Department's decision. As explained by Marquis Smith, head of the Division's San Francisco Office, in his testimony before this Court, only one day per week of grand jury time

On December 11, 1973, Rashid wrote a memorandum to Thomas Kauper, head of the Antitrust Division, recommending approval of a proposed indictment against the gypsum defendants. On December 20, Kauper in turn recommended approval of the indictment to Acting Attorney General Bork. On December 27, 1973, the indictment herein was filed.

Defendants are unable to point to even a single isolated example of what they claim to be an over-all pattern of undue delay on the part of the Government which took place during the time the grand jury was in session. This is so even though it took almost two and one-half years, from August of 1971 until December of 1973 for the grand jury to return an indictment. To my mind, this amounts to tacit recognition of the fact that little else could be expected, given the titanic scope of the Government's undertaking. A mere glance at the mountains of documentary evidence *already* filed in this case should be enough to convince even the most skeptical of observers that a great deal of time was necessary to get this case through the grand jury process. Moreover, the point that the explanation for the length of time it has taken to obtain an indictment lies primarily in the mammoth dimensions of this case, and nowhere else, is valid when applied to the entire period under review here, not just the period when the grand jury was in session. The defendants in this case have introduced no evidence and have elicited no testimony sufficient to even raise the inference, let alone clearly · demonstrate, that the Government, at any time from 1961 through 1973, ever even entertained the notion of engaging in deliberate procrastination for the purpose of obtaining improper tactical advantage over the defendants.

Faced with this fundamental obstacle to the achievement of their goal, the defendants have resorted to quoting out of context from various of the internal Government memoranda in their possession, as if to say that this indictment should be dismissed because it is less than ironclad. For instance, they quote from the previously mentioned December 11, 1973 memorandum from Rashid to Kauper, the following language:

"With respect to most of the [proposed individual defendants], the evidence falls short of identifying specific affirmative acts in furtherance of the conspiracy within the five-year statutory period."

At this point, it should be noted that the defendants have had, as the Court has had, access to extremely candid analyses of Justice Department policymaking, written during the period in question; the above-quoted material is an example. In anticipation of the evidentiary hearing, defendants subpoenaed all internal Governmental memoranda dealing with the gypsum defendants during the 1961–1973 period. This large quantity of material, the largest portion of which consists of interdepartmental communications written by Justice Department personnel to their superiors with the expectation of complete confidentiality, was examined in detail by the Court *in camera* during the course of the hearing. Defendants were then informed that, despite the prosecution's strenuous objections to my doing so, the material would be turned over to them for their examination.

My ruling was not intended to establish a precedent for the future, but was made because of the unique nature of the proffered defense in this case. The defendants had contended that delay in bringing an indictment or, indeed in empanelling a grand jury, had been an intentional tactical device by the Government here. Recognizing that proof of this could be found only in the Government's files, if, indeed, it

---

was available in the Northern District of California for Justice Department use. The convening of a grand jury in Pittsburgh would

thus appear to have been a time-saving rather than a time-wasting measure.

existed at all, I made my ruling so as to grant defendants access to all material which might have any bearing on the point they wished to prove. Even though my *in camera* examination indicated that the documents did not help the defense and, in fact, served to demonstrate the opposite conclusion from that which they hoped to prove, I decided to make the documents available so that defense counsel could decide as to utility of the material. I did this reluctantly because I realize that within the Government, superiors should be able to expect frank and full comment by their subordinates in matters such as this and because making such documents available to defense counsel in this case might have a chilling effect on such full disclosure and openness in comment in the future. As I have indicated, I believe that because the empanelling of a grand jury or the return of an indictment entail drastic consequences for the persons investigated or indicted, such measures should be taken only after full consideration of all factors involved. Hopefully, the release of these documents to defense counsel will not result in any reluctance on the part of Governmental staff personnel to fully and forthrightly set forth their views when such matters are under consideration.

Nevertheless, after balancing all the factors in this case, it seemed to me that the fair thing to do was to allow the defense to examine documents to see if there was, in fact, matter contained therein that would be useful in their argument. On balance, and with recent precedent for my thinking, I reasoned that the Government's claims of privilege and confidentiality must give way to the rights of defendants in criminal proceedings. See United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

By making this material available, I certainly did not mean to permit arguments at this stage on the ultimate strength or weakness of the Government's case. By the same token, neither do I intend to imply that views expressed by Government staff members on such issues will be admissible at the trial of the merits. The ultimate strength or weakness of the Government's case will be determined at the appropriate stage of the proceedings.

Throughout this mass of internal Government memoranda, which serves to reveal in intimate detail the process leading to the return of the indictment against these defendants, there is only one explicit reference to a policy of delay. This is found on a buckslip attached to a letter dated May 28, 1965, routed between FTC personnel. The buckslip states as follows:

"The gypsum companies are serious about wanting the proposed rules issued and have been needling me from time to time to get on with the project. This letter is one of those needles. Since I have no 'progress' to report to the industry, I suggest that this letter be answered by my successor to the project *who can start all over again with the delaying tactic that he hasn't studied the matter, etc.*"

Because the slip evidences FTC, not Justice Department, thinking, in 1965, well before a full gypsum investigation had begun, and is in specific reference to the promulgation of FTC trade practice rules and nothing else, I feel its probative effect as to the question before this Court is almost nil.

Thus, upon a thorough review of the evidence and testimony, I have concluded that there is nothing to support a conclusion that the Government has engaged, intentionally or otherwise, in anything like a conscious policy of delay designed to adversely affect defendants' rights. To the contrary, I have concluded that, given the inherent difficulties involved in orchestrating and assembling a nationwide investigation of the pricing policies of an entire in-

dustry, the Government has proceeded throughout with all due deliberate speed.

## THE ISSUE OF PREJUDICE

Because I have determined that there is no evidence of unreasonable delay on the part of the Government, there is little need to devote a great deal of attention to defendants' corollary contention that they have suffered substantial prejudice as a result of the Government's unproven delay. Defendants argue that they have been severely prejudiced by the death, retirement or dimmed memories of many potential witnesses. They list 33 persons who have had some connection with the gypsum industry who have died in the ten years since 1964. They also list 75 individuals who have retired, resigned or otherwise ended their association with the gypsum industry in the years since 1962. As to this latter group, defendants contend that they are prejudiced because the passage of the years has so irrevocably dimmed this group's collective memory as to render them incapable of accurate testimony concerning events called in question by means of this indictment.

I do not find that defendants have been prejudiced to any extraordinary degree whatsoever by the chain of events leading to this indictment. Several potential witnesses may have died, but enough remain alive to insure what this Court is told will be a six-month trial. Memories may have been dimmed by the passage of time but, as defendants are well aware, the Government as well as themselves will have to contend with this commonplace difficulty. Moreover, and most importantly, a finding of prejudice to the defendants would have significance only if it had been determined that the Government had intentionally engaged in a pattern of tactically-motivated delay. Absent a finding of intentional delay, the question of prejudice is all but moot.

## CONTENTION OF U.S. GYPSUM

■■ Defendant United States Gypsum supplements the motion to dismiss filed on behalf of all defendants by complaining that it is concurrently defending four different proceedings in four different jurisdictions, each arising out of a single course of action. These are: 1) this indictment, 2) the Government's civil damage action in the Northern District of California, 3) the Government's criminal contempt petition in the District of Columbia, and 4) a Federal income tax deficiency proceeding to disallow several million dollars in price adjustments which arose out of the price fixing adjudicated in the *Wall Products* case. The simple answer to U.S. Gypsum's complaint that the Government is throwing the book at it is that this Court has jurisdiction only over the indictment filed in this case and is powerless to affect their predicament elsewhere. But even if that were not so, the arguments advanced by U.S. Gypsum, based upon ill-conceived notions of collateral estoppel and *res judicata,* demonstrate only that the sequence of events under consideration is uncommon. This Court is simply not convinced that this pattern of what U.S. Gypsum labels "harassment" is constitutionally or otherwise legally impermissible.

■■ U.S. Gypsum also attacks the tax deficiency proceedings against it with the convoluted argument that since the Internal Revenue Service (IRS) disclosed certain information gained in its investigation of U.S. Gypsum to Justice Department officials without technical compliance with the authorization requirements of 26 U.S.C. § 6103, this indictment must be dismissed under the fruit of the poisonous tree doctrine. The argument fails for two reasons. First, insofar as U.S. Gypsum's attack is upon the tax deficiency proceedings themselves, their argument, while it may be appropriate in another Federal forum, is inappropriate in this one. Second, and most

importantly, U.S. Gypsum's whole elaborate syllogism must fail because there was no illegal disclosure by IRS officials to the Justice Department. All internal Government memoranda pertaining to this matter were subpoenaed by U.S. Gypsum and subsequently examined by the Court *in camera* and those deemed appropriate were made available to defendants. These documents, and the testimony of the witnesses called at the evidentiary hearing, reveal that while there have been meetings and consultations between various Internal Revenue Service and Justice Department personnel in regard to investigation of and possible action against U.S. Gypsum, there has been no disclosure, authorized or unauthorized, from the Internal Revenue Service to the Justice Department or *vice versa*, which was in contravention of IRC § 6103 and its supporting regulations or any other Federal law. Defendant U.S. Gypsum's argument is without merit.

CONCLUSION

Defendants' approach can be accurately described as an elaborate effort to sidestep the effect of the statute of limitations in this case. The *Marion* opinion, defendants' starting point in their argument prefaces its discussion with a statement that the applicable statute of limitations (in this case five years per 18 U.S.C. § 3282) remains the "primary guarantee" against the bringing of stale claims, (*Marion, supra,* 404 U.S. at 322, 92 S.Ct. 455). Any court considering the question of prejudicial preaccusation delay is always left with the ultimate question—were there acts committed within the statutory period or were there not? From a defendant's point of view, the utility of the *Marion* doctrine is thus limited by the existence of this often unarticulated but ever-present question. Here, defendants have failed to show themselves to fall within *Marion's* bounds. For that reason their motion will be denied.