537 F.2d 1307
 1976-2 Trade Cases 61,045
 RESPONSE OF CAROLINA, INC., Florida Computer Response, Inc.,
Datatron Corporation, Response of Colorado, Inc.,
Plaintiffs-Appellants,
v.
LEASCO RESPONSE, INC., Defendant-Appellee.
LEASCO RESPONSE, INC., Plaintiff-Appellee,
v.
John WRIGHT, Defendant-Appellant.
 No. 75-3052.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 2, 1976.
 
 J. Kirk Wood, R. Benjamine Reid, Joseph W. Womack, Miami, Fla., for plaintiffs-appellants.
 Anthony F. Phillips, New York City, for defendant-appellee.
 Appeal from the United States District Court for the Southern District of Florida.
 Before DYER, SIMPSON and RONEY, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 This is an appeal from a judgment in favor of Leasco Response, Inc. (Leasco) in a suit brought by four of its former franchisees for alleged violations of the anti-trust laws. In a bifurcated trial, the district court directed a verdict for Leasco at the close of franchisees' case. The franchisees, Response of Carolina (Carolina), Florida Computer Response (Miami), Datatron Corporation (Datatron) and Response of Colorado (Denver) alleged that Leasco imposed territorial restrictions on their sale of computer time-sharing services and that Leasco tied the sale of the franchise to the lease of computer hardware from Leasco. The question presented here is whether, particularly in light of the bifurcated trial procedure, the district court erred in directing a verdict for Leasco, having found that there was no substantial evidence under the standard of Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365 (en banc), to establish Leasco's antitrust liability. We affirm.
 
 I.
 
 2
 Leasco entered the computer time-sharing business in 1969. Using a modified Hewlett-Packard 2000A central processing unit as the core of its system, it opened service branches in several major cities in the United States. The computer system was called "Response I."
 
 
 3
 In 1970, Leasco decided to franchise the Response I system. Its first franchise was opened in September, 1970, in Phoenix, Arizona. Two of the plaintiffs, Carolina and Datatron, began operations in Charlotte, North Carolina, and Louisville, Kentucky, respectively in June, 1971. The Denver plaintiff opened its doors in September, 1971, and the Miami plaintiff started in March, 1972.
 
 
 4
 The franchise agreement was called the Data Network Contract (DNC). While each of the four contracts involved in this case contained slight differences, their pertinent provisions are the same for all plaintiffs.
 
 
 5
 According to the DNC, Leasco granted to its franchisee the exclusive right to market Response Service[1] using franchise-controlled computer hardware, together with a license to use any rights that Leasco may have in the name "Response" within an area of primary responsibility.
 
 
 6
 The area of primary responsibility (APR) was described in an exhibit to each DNC, listing the counties within the area. Leasco agreed not to offer Response Service to any other person in the area except that Leasco was permitted to sell and solicit the sale of its time-sharing service to companies having offices both within and without franchisees' areas, so called "national accounts." Each franchisee agreed to "diligently promote the sale of Response Service" throughout the area of primary responsibility.
 
 
 7
 The DNC did not prohibit extra-territorial sales by franchisees. It provided for royalty payments to Leasco of 15 percent of monthly gross sales to customers within the area. However, the royalty was increased to 70 percent for sales to customers outside of the area.[2] It is this paragraph of the DNC which gives rise to the claimed territorial restriction.
 
 
 8
 "Response Service" provided under the DNC did not include computer hardware,[3] although it referred to a Hewlett/Packard computer.[4] In Paragraph 4 of the DNC Leasco stated its willingness to lease to franchisees the items of equipment listed in Exhibit B to the contract,[5] according to the terms of the lease also incorporated in Exhibit B. If this offer was accepted, Leasco agreed to set up and install the Response Equipment without charge on the franchisee's premises. Each franchisee signed an equipment lease for a term of 60 months.[6] As is explained more fully, infra, franchisees' tying argument centers around the lease of this equipment.
 
 
 9
 On June 21, 1973, Leasco filed suit against Carolina in a North Carolina state court to collect unpaid rentals, maintenance fees, and other amounts due under the lease and to recover possession of the leased equipment. One day later, Carolina filed suit in the United States District Court for the Southern District of Florida against Leasco alleging that Leasco violated the antitrust laws[7] by (1) the imposition of territorial restrictions on the area within which Carolina might sell Response Service, by exacting 70 percent of monthly gross sales to customers outside of Carolina's area of primary responsibility; (2) price fixing; (3) discriminatorily favoring its branches over its franchises; and (4) attempted monopolization.[8] On August 3, 1973, Miami filed suit against Leasco on similar grounds. Datatron's complaint followed on August 16, 1973, and Colorado's was filed on August 20, 1973.[9] No allegations of a tying arrangement were made in any of the complaints. On April 16, 1974, the cases were consolidated.
 
 
 10
 Extensive discovery was had by all parties in 1973 and the first nine months of 1974. On October 15, 1974, the parties filed a pre-trial stipulation wherein they agreed on no issues of fact or law. However, in this document both franchisees and Leasco stated that a tying claim was an issue to be considered at trial.[10]
 
 
 11
 On October 18, 1974, at a pre-trial conference the district court stated that it was its disposition "to try liability first and then go to damages," using the same jury.[11] Leasco objected to this bifurcation procedure, but there was no discussion of the objection by the district court. Later in the conference, franchisees' counsel asked whether an order would be entered as to the separation of the trial into two stages. The district court stated simply that liability would be tried first. There was no other discussion by the district court and counsel of this decision anywhere in the pre-trial record.
 
 
 12
 On November 11, 1974, the trial commenced and plaintiffs concluded presentation of their evidence on February 20, 1975. On February 28, 1975, the district court heard arguments on Leasco's motion for a directed verdict on the antitrust and fraud counts of the complaints.[12] On March 3, 1975, the district court granted Leasco's motion with respect to all antitrust issues raised by franchisees. It denied the motion with respect to the fraud issues and the trial proceeded. After a jury verdict for Leasco on the fraud counts[13] the district court entered its final judgment in favor of Leasco.
 
 
 13
 Franchisees' motions for a new trial asserting error in directing a verdict for Leasco on the antitrust claims were subsequently denied and they appealed. They address their appeal solely to the propriety of the district court's directed verdict for Leasco on the territorial restriction and tying claims.
 
 II.
 
 14
 The district court found that "firm and resolute" or, at least, some measure of enforcement of a vertical territorial restriction is necessary to render it actionable. Since it found no evidence of enforcement, it directed a verdict in Leasco's favor on this alleged antitrust violation. Franchisees contend that this was error.
 
 
 15
 Section one of the Sherman Antitrust Act, 15 U.S.C.A. § 1, provides that "every contract, combination . . . or conspiracy in restraint of trade or commerce . . . is . . . illegal." "Every" is not meant literally; rather the standard of reasonableness has been adopted to judge the lawfulness of the restraint, Standard Oil Co. v. United States, 1911, 221 U.S. 1, 66, 31 S.Ct. 502, 55 L.Ed. 619; Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683.
 
 
 16
 Certain practices have such a "pernicious effect on competition," Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545, that they are considered to be per se violations of Section one.[14] Vertical territorial restraints were excluded from that category initially, White Motor Co. v. United States, 1963, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738, but later were included, United States v. Arnold, Schwinn & Co., 1967, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249.
 
 
 17
 In White Motor, the Supreme Court was faced for the first time with territorial and customer restrictions. White Motor's agreement with its distributors and dealers expressly limited the territory within which and the customers to whom they might sell trucks and parts. The Supreme Court held that the legality of these vertical restraints should be determined only after a trial since it did not know enough about the "economic or business stuff out of which these arrangements emerge" to be certain of their purpose or effect. "We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack . . . any redeeming virtue' . . . and therefore should be classified as per se violations of the Sherman Act." 372 U.S. at 263, 83 S.Ct. at 702.
 
 
 18
 Four years later in Schwinn, the legality of such restraints suffered the opposite fate. Schwinn had two principal methods of selling its bicycles. It sold to retailers by means of consignment or agency arrangements with 22 distributors under the so-called Schwinn Plan which involved direct shipment by Schwinn to the retailer with Schwinn invoicing the retailer, extending credit, and paying a commission to the distributor taking the order. And it sold bicycles to distributors who maintained an inventory to supply retailers with emergency and "fill-in" requirements.[15] Schwinn assigned specific territories on an exclusive basis to each distributor. It instructed each distributor to sell only to franchised Schwinn retailers in their respective territories. Each franchised retailer was to purchase only from or through the distributor authorized to serve his particular area and was to sell only to consumers and not to unfranchised retailers.
 
 
 19
 The Court held that where a manufacturer sells products to his distributor subject to territorial or customer restrictions upon resale, a per se violation of the Sherman Act results. "Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it." 388 U.S. at 379, 87 S.Ct. at 1865. Hence, Schwinn was enjoined from limiting the freedom of its distributors and retailers who buy products from Schwinn to dispose of the products "where and to whomever they choose." Id. at 378, 87 S.Ct. at 1865.
 
 
 20
 With respect to consignment or agency sales by Schwinn the Court held that, under the rule of reason, where Schwinn retains all indicia of ownership, including title, dominion, and risk of loss and so long as the dealers in question are indistinguishable in function from agents or salesmen, the vertical territorial restriction was not an "unreasonable" restraint of trade. 388 U.S. at 381, 87 S.Ct. at 1856.
 
 
 21
 The critical element of a "contract, combination, or conspiracy," easily found in White Motor because of the express contractual territorial restriction, was not clearly identified by the Court in Schwinn. The Court did not quote the language of any of the agreements between Schwinn and its distributors and retailers so there does not appear to have been an express contractual restriction. Justice Stewart's dissenting opinion supports this view when it states that Schwinn's distribution policy was "implemented largely through request and persuasion by Schwinn." 388 U.S. at 385, 87 S.Ct. at 1868. And the majority opinion made clear that there were no horizontal overtones to the restrictions in issue:
 
 
 22
 (W)e are dealing here with a vertical restraint embodying the unilateral program of a single manufacturer. We are not dealing with a combination . . . of distributors . . . . We are not dealing with a "division" of territory in the sense of an allocation by and among the distributors, . . . or an agreement among distributors to restrict their competition . . . . We are here concerned with a truly vertical arrangement, raising the fundamental question of the degree to which a manufacturer may not only select the customers to whom he will sell, but also allocate territories for resale and confine access to his product to selected, or franchised, retailers. 388 U.S. at 378, 87 S.Ct. at 1865.
 
 
 23
 With respect to transactions in which distributors purchased bicycles for resale, at least, the district court expressly found a conspiracy between the distributors and Schwinn to restrain trade. 388 U.S. at 371, 87 S.Ct. 1856. However, the district court's finding of a conspiracy did not embrace agency or consignment sales by distributors. And with respect to the restrictions on retailers, the district court stated that the Schwinn franchising program " 'was conceived, hatched and born into life . . . in the minds of the Schwinn officials,' and agreed that 'the action was unilateral in nature.' " 388 U.S. at 391, 87 S.Ct. at 1871, fn. 12 (Stewart, J., dissenting).
 
 
 24
 The Court does not tell us in Schwinn the source of the necessary contract, combination or conspiracy with respect to the territorial restrictions on distributors when acting as agents or consignees and the customer restrictions on retailers. According to Justice Stewart's dissent, the "firm and resolute enforcement" language of the majority opinion was intended to satisfy in his view, unsatisfactorily the Sherman Act jurisdictional requirement of an agreement for these two practices. 388 U.S. at 391, 87 S.Ct. 1856, fn. 12. The district court had rejected the government's contentions that Schwinn in fact cancelled the franchises of some retailers because of sales to unauthorized customers and that distributors had been cut off because of sales to unauthorized customers in violation of territorial limitations. The government argued to the Court that these findings were clearly erroneous. The Court stated:
 
 
 25
 In any event, it is clear and entirely consistent with the District Court's findings that Schwinn has been "firm and resolute" in insisting upon observance of territorial and customer limitations by its bicycle distributors and upon confining sales by franchised retailers to consumers, and that Schwinn's "firmness" in these respects was grounded upon the communicated danger of termination. Our analysis will embrace this conclusion, rather than the finding which is urged by the Government and which was refused by the trial court that Schwinn actually terminated retail franchises or cut off distributors for the suggested reasons. 388 U.S. at 372, 87 S.Ct. at 1862.
 
 
 26
 Thus, despite the unilateral nature of the distribution policies of Schwinn, Schwinn's enforcement of the policies acquiesced in by both the franchised retailers and wholesale distributors amounted to a contract, combination, or conspiracy for Sherman Act purposes.[16]
 
 
 27
 Albrecht v. Herald Company, 1968, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998, confirms this view. Albrecht was a newspaper carrier for respondent newspaper company. All carriers had exclusive territories subject to termination if prices exceeded respondent's advertised suggested maximum price. Albrecht adhered to the advertised price for some time but then raised his prices. Respondent objected to no avail and later wrote Albrecht to inform him that it was writing to subscribers on his route to offer them the newspaper at the lower price. Respondent also hired a circulation company to engage in a solicitation of customers along Albrecht's route. Respondent continued to sell newspapers to Albrecht but warned him it would stop doing so if he continued to overcharge. In addition, resident found a carrier, Kroner, to deliver papers to respondent's customers, most of whom were previously Albrecht's. Albrecht sued charging a combination between respondent and Albrecht's customers or the circulation company or Kroner. The jury found for respondent and a motion for a judgment notwithstanding the verdict was denied. The court of appeals affirmed the denial in part on the ground that respondent's action was unilateral.
 
 
 28
 Relying on United States v. Parke, Davis & Co., 362 U.S. at 45-47, 80 S.Ct. 503,[17] the Supreme Court reversed, finding a combination between respondent, the circulation company, and Kroner to force Albrecht to conform to the advertised retail price. In a footnote, the Court stated that under Parke, Davis, Albrecht could have claimed a combination between respondent and himself, "at least as of the day he unwillingly complied with respondent's advertised price." "Likewise," said the Court citing Schwinn's discussion of firm and resolute enforcement, "he might successfully have claimed that respondent had combined with other carriers because the firmly enforced price policy applied to all carriers, most of whom acquiesced in it." 390 U.S. at 150, 88 S.Ct. at 872, fn. 6. Reliance on Schwinn makes it clear that the firm and resolute language in that opinion was meant to show the existence of an agreement.
 
 
 29
 The post-Schwinn treatment of the "firm and resolute enforcement" language of the Court has followed an erratic course. We chart it to explain our holdings, infra, on the existence of a violation here.
 
 
 30
 Janel Sales Corp. v. Lanvin Parfums, Inc., 2 Cir. 1968, 396 F.2d 398, cert. denied, 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed. 275, involved an express contractual customer restriction where the "retailer" agreed to sell certain "commodities" only to "consumers for use." Plaintiffs argued that this was a per se violation of the Sherman Act § 1. The jury found that there was no agreement on customer restrictions and the court upheld this finding saying that "firm and resolute" insistence on compliance with the restriction was necessary before a violation could be found.[18] Id. at 406.
 
 
 31
 Three years later, in Beverage Distributors, Inc. v. Olympia Brewing Company, 9 Cir. 1971, 440 F.2d 21, cert. denied, 403 U.S. 906, 91 S.Ct. 2209, 29 L.Ed.2d 682, plaintiff beer distributor argued that defendant brewing company had imposed territorial restrictions upon the resale of its beer. However, the distributorship agreement contained no reference to territorial restrictions. Hence, plaintiff was faced with the same dilemma as the government in Schwinn : the need to show a contract, combination or conspiracy. The jury found that there was none of these and the court held that there was sufficient evidence to support the verdict, concluding that "if there was any restraint on plaintiff it was self imposed." Id. at 30-31.
 
 
 32
 Next, in Colorado Pump & Supply Co. v. Febco, Inc., 10 Cir. 1973, 472 F.2d 637, cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965, plaintiff and defendant Thompson were competing wholesale distributors of defendant Febco's products. Febco then entered into an exclusive distributorship with Thompson which authorized Thompson "to sell within the following territory (Colorado and some adjacent areas)." As a result of this arrangement, plaintiff could not buy directly from Febco and had to buy from Thompson at a lesser discount than it had been receiving from Febco. The court stated that the territorial limitation did not mention outside sales and the testimony was that outside sales could have been made, though none had been. It concluded that the limitation created no more than an area of primary responsibility,[19] and, relying on Janel Sales Corp., supra,[20] the court found no firm and resolute enforcement of any territorial restriction.
 
 
 33
 About a year later, in Good Investment Promotions, Inc. v. Corning Glass Works, 6 Cir. 1974, 493 F.2d 891, alleged customer restrictions were in issue. The district court had granted a summary judgment to plaintiff relying on the per se rule of Schwinn. The court of appeals reversed saying, in part, that the record is "devoid of any information from which it may be determined that ' . . . firm and resolute (insistence) upon observance of . . . customer limitations' was required by Corning, such as was the situation in Schwinn." Id. at 893. It is unclear from the opinion whether the court was treating the firm and resolute language as necessary to establish an agreement in the absence of a contractual restriction or whether it was treating it as a defense to the charge of violation.
 
 
 34
 In Copper Liquor, Inc. v. Adolph Coors Co., 5 Cir. 1975, 506 F.2d 934, we were faced with an express territorial restriction in which a beer distributor promised to conduct his distribution exclusively within a prescribed territory. Referring to the "firm and resolute" language as an "exception" we did not consider its significance because it was "apparent" that Coors had been firm and resolute in enforcing the territorial restrictions. Id. at 944.
 
 
 35
 Four months later the Eighth Circuit decided Reed Brothers, Inc. v. Monsanto Co., 8 Cir. 1975, 525 F.2d 486, cert. denied, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 which involved (1) an area of primary responsibility clause, (2) a shipping and pick-up policy which provided that deliveries would only be made to destinations within the APR and pick-ups would be accepted only at Monsanto warehouses within the ordering distributor's APR and (3) a rebate program whereby a distributor would receive a rebate on all Monsanto herbicides sold directly to retailers (as opposed to wholesalers or discounters). The jury found for plaintiff wholesaler.[21] However, the district court granted Monsanto's motion for a judgment n. o. v. because there was insufficient evidence of a contract, combination or conspiracy between Monsanto and its distributors to restrict the sale of herbicides to retailers in assigned territories. Monsanto's attempt to defend this position failed. Relying on Parke, Davis & Co., supra, the court of appeals stated that Monsanto's "legitimate" APR contract formed the base for an illegitimate agreement to restrict territorial and customer sales. It held that there was sufficient evidence to show that Monsanto firmly and resolutely enforced territorial restrictions by means of its shipping and pick-up policy, 525 F.2d at 495-96. In addition to this evidence "relating to the way in which Monsanto's shipping policy change acted as a coercive tool for enforcing its primary area of responsibility contract," the court found "clear evidence" that its rebate program was a "cooperative" one amounting to a contract, combination or conspiracy, 525 F.2d at 496-97. Therefore, the court upheld the jury's finding. Cf. Beverage Distributors, Inc. v. Olympic Brewing Co., supra. The Court went on to hold that the conflicting evidence in the record as to whether the effect of the agreement was to prohibit distributors from selling to Reed inside or outside of assigned territories, i. e., to restrain trade, was for the jury to weigh and that the evidence was sufficient for the jury to find that "Monsanto made rebate policies and enforced its 'area of primary responsibility' contracts through shipping policies which had the effect of restricting its distributors in the resale of its products." Id. at 498. Cf. Knutson v. Daily Review, Inc., N.D.Cal.1974, 383 F.Supp. 1346, 1368-69.
 
 
 36
 The Reed court properly used the firm and resolute language to support a finding of an agreement. This was also done in World of Sleep v. Stearns & Foster Co., 10 Cir. 1975, 525 F.2d 40, but with the opposite result. Defendant sold bedding products to plaintiff in Denver. There was no contract or agreement of any kind involved. Plaintiff opened a store in Atlanta and requested that defendant sell to it there. Defendant refused, citing its loyalty to another department store in Atlanta. Hence, plaintiff began to ship defendant's products from its Denver store to its Atlanta store. After an unavailing protest, defendant stopped selling bedding products to plaintiff. The plaintiff sued and the jury found for defendant. The court interpreted the per se rule of Schwinn as follows: "where a manufacturer . . . sells his product to a distributor . . . and in connection with such sale 'firmly and resolutely' subjects the distributor to territorial restrictions upon resale, whether by 'explicit agreement or silent combination or understanding with his vendee', a per se violation of the Sherman Act results." Id. at 44. The court properly equated "firm and resolute enforcement" with the Section one requirement of an agreement despite the Tenth Circuit's earlier ambiguous decision in Colorado Pump & Supply Co., supra.[22]
 
 
 37
 The Tenth Circuit decided Redd v. Shell Oil Co., 10 Cir. 1975, 524 F.2d 1054, cert. denied, --- U.S. ----, 96 S.Ct. 1508, 47 L.Ed.2d 762, four days later which involved an agreement containing "clear restrictions on the area within which plaintiff could sell." Id. at 1057. Although an apparent contractual resale restriction existed, the court, notwithstanding what appears to be a clear holding in World of Sleep, relied on Colorado Pump and Janel Sales in holding that there must be firm and resolute enforcement action "in addition to contractual provisions for territorial restrictions," Id. at 1058, before an antitrust violation exists.
 
 
 38
 In our decision in Eastex Aviation, Inc. v. Sperry & Hutchison Co., 5 Cir. 1975, 522 F.2d 1299, which involved explicit contractual customer restrictions on resale of S & H green stamps, we characterized the "firm and resolute" cases as decisional exceptions to Schwinn but did not analyze their meaning because we found that the restrictions were enforced. Id. at 1307.
 
 
 39
 Finally, in Pitchford v. Pepi, Inc., 3 Cir. 1976, 531 F.2d 92, cert. denied --- U.S. ----, 96 S.Ct. 2649, 49 L.Ed.2d 387, 44 L.W. 3714, a manufacturer of electronic equipment imposed explicit territorial restrictions by contract upon plaintiff distributor. The court upheld the jury's finding of a per se violation of the Sherman Act under Schwinn, once it found that there was enough evidence (1) to show that plaintiff purchased goods for resale and (2) to enable a jury to find that defendants enforced their territorial policy. The decision is complicated somewhat by an alternative holding that a horizontal division of markets existed "even if the Schwinn prohibition of vertical restraints were not dispositive." Id. at 104.
 
 
 40
 In our view, none of these cases have analytically dealt with the difference between Schwinn's territorial "restriction" and various post-Schwinn "limitations" and the importance of an express agreement containing either the restriction or limitation.
 
 
 41
 Schwinn's territorial "restriction" absolutely barred distributors from making extra-territorial sales. However, because this restriction was not contractually created, the Court determined that a contract, combination or conspiracy existed because of Schwinn's firm and resolute enforcement of the restrictions and the distributors' inferable acquiescence therein.
 
 
 42
 Where a territorial or customer "restriction" is created by contract, the Sherman Act's Section one jurisdictional requirement is met and a per se violation exists whether or not the restriction has been enforced, much less firmly and resolutely enforced, unless it is otherwise sheltered by a decisional exception to Schwinn.[23] Hence, we cannot subscribe to the reasoning of cases like Janel Sales and Redd.[24]
 
 
 43
 However, most post-Schwinn vertical restraints, not surprisingly, have taken the form of territorial "limitations": arrangements which do not bar extra-territorial sales but may inhibit them. Where these limitations are contractually created, see Colorado Pump & Supply Co., supra, the "firm and resolute enforcement" language of Schwinn has no relevance to their legality.[25]
 
 
 44
 We turn now to the correctness of the district court's directed verdict for Leasco on the existence of an antitrust violation. The district court held that "some measure of enforcement of a vertical territorial restriction, at least in a franchise context, must take place to render such a restriction actionable." Finding no evidence of enforcement, it directed a verdict for Leasco. As the foregoing discussion makes clear, this holding was error.[26] There was a contract between the parties containing a vertical limitation accompanied by a disparate royalty for inside and outside-area sales. Proof of enforcement was not necessary to show the existence of an agreement as it was in Schwinn. The question which should have been asked is whether, considering the evidence in the light most favorable to the franchisees, there was evidence "of such quality and weight that reasonable men in the exercise of impartial judgment might reach different conclusions," Boeing Co. v. Shipman, supra, 411 F.2d at 374, to create a jury question on whether the Leasco APR clause and the 70 percent royalty on outside sales resulted in fact in the imposition of territorial restrictions on the sale of computer time by its franchisees.[27] We hold that there was. In our view, these contract terms were sufficient to create a jury question. The APR clause itself is unobjectionable. However, the disparity between the 15 percent royalty on inside area sales and 70 percent on outside sales was so great[28] that, taken together with the APR, a jury could infer that territorial restrictions were being imposed by Leasco.[29]
 
 
 45
 There was other evidence to support this inference. Leasco inter-office memoranda stated that the royalty payment of 70 percent served the purpose of deterring or dissuading outside sales. The former Leasco Director of Finance testified that Harris, one of the architects of the Leasco franchise system, told him that the purpose of the 70 percent royalty was to dissuade the franchisees from going out of their territory. And at least with respect to Datatron there was proffered testimony that it would take a loss on any sale it made outside of its area if it paid Leasco the 70 percent royalty.[30]
 
 
 46
 However, our holding that the district court erred in directing a verdict for Leasco on the existence of territorial restrictions does not end our inquiry, for the district court also held that the franchisees failed to show the fact of damage required to support an award of treble damages under the antitrust laws. It is this ruling to which we now turn our attention.
 
 III.
 
 47
 In order to recover treble damages under the antitrust laws, a plaintiff must show a violation of the antitrust laws, the fact of damage, and some indication of the amount of damage. Terrell v. Household Goods Carriers' Bureau, 5 Cir. 1974, 494 F.2d 16, 20, 15 U.S.C.A. § 15. To be "liable" under the antitrust laws, therefore, means that one has violated the antitrust laws and that violation has resulted in an injury to the business or property of the plaintiff, i. e., there was fact of damage.
 
 
 48
 Franchisees vigorously contest this conclusion. They argue that "liability" should be equated with "violation," generally, or, at least in a bifurcated trial. They say this Court held as much in Copper Liquid v. Adolph Coors, Inc., supra.
 
 
 49
 Next, they argue that they have shown sufficient evidence of fact of damage to avoid a directed verdict under Boeing Co. v. Shipman. Finally, franchisees contend that if they have not shown fact of damage, it is because they were prejudiced in the presentation of evidence of it by the district court's bifurcation order. We reject all of these contentions.
 
 
 50
 Terrell establishes that "liability" for antitrust purposes means a showing of both an antitrust violation and fact of damage. It involved a conspiracy by defendants to eliminate Terrell as a competitor in the preparation and dissemination of mileage guides. Terrell prevailed in a jury trial but this Court en banc reversed the judgment of the district court with respect to the award of damages. We deemed it unnecessary to require a retrial on the issue of defendant's liability because there was "ample evidence to support a finding by the jury that the Sherman Act has been violated." 5 Cir., 452 F.2d 152, 160. After a jury verdict for Terrell on remand, the defendants argued that evidence of fact of damage was required on retrial and was insufficient to support the verdict. We disagreed, recognizing that in a private antitrust action, "there is no neat dividing line between the issues of liability and damages," but holding that the en banc decision affirming the trial court on the issue of liability "necessarily encompassed the findings (of the jury) on the legal violation and causation or fact of damage." 494 F.2d at 21.
 
 
 51
 Nothing that we said in Coors is to the contrary. There we found sufficient evidence to support the jury's finding of an antitrust violation, but found insufficient evidence to show that the violation caused plaintiff the injury alleged. The trial was not bifurcated in the district court. There was no issued raised as to meaning of the word "liability." We simply recognized that two elements exist before damages may be awarded under the antitrust laws but we found only one of them present. The fact that we remanded the case for a new trial on the issue of fact of damage was not a holding that the "fact of damage" belongs in Phase II of a bifurcated trial on liability and damages. Franchisees' attempt to read Coors in this manner takes the holding of that case beyond its contours.
 
 
 52
 Nor does the meaning of "liability" for antitrust purposes change when a trial is bifurcated.[31] We perceive no basis in law or logic to give " liability" different meanings depending upon the trial procedure used. While we recognize that a finding of "liability" in phase I of a bifurcated trial is interlocutory, Haverhill Gazette Co. v. Union Leader, 1 Cir. 1964, 333 F.2d 798, 803, cert. denied, 379 U.S. 931, 85 S.Ct. 329, 13 L.Ed.2d 343,[32] cf. Wall Products Co. v. National Gypsum Co., N.D.Cal.1971, 326 F.Supp. 295, 296 (Wall I ) and 357 F.Supp. 832, 835 (Wall II ),[33] this in no way diminishes the requirement that a plaintiff show some evidence that the violation caused him injury before a defendant is found "liable." Put in other terms, if the trial is bifurcated between liability and damages, there must be some evidence showing a causal link[34] between the violation and alleged injury in phase I, before a plaintiff may enter phase II.
 
 
 53
 To show fact of damage, an antitrust plaintiff need not show that the violation was the sole cause of the alleged injury. He need only show that it was a material cause. Zenith Radio Corp. v. Hazeltine Research, 1969,395 U.S. 100, 114, 89 S.Ct. 1562, 23 L.Ed.2d 129, fn. 9. However, this showing may not be based on speculation. The required causal link must be proved "as a matter of fact and with a fair degree of certainty." Terrell v. Household Goods Carriers' Bureau, supra, 494 F.2d at 20.[35]
 
 
 54
 Each franchisee had the task, therefore, of demonstrating that the alleged territorial restriction materially contributed to some injury to its business as a matter of fact and with a fair degree of certainty. We hold that under Boeing the evidence fails to support a claim that any of the franchisees were damaged by virtue of the alleged territorial restriction.
 
 
 55
 The principals in the Carolina franchise were Crane, Robert Johnson, and Mummaw. Their testimony belies Carolina's claim that it was damaged in any way by the territorial restriction.
 
 
 56
 Crane testified that Harris, one of the organizers of the Leasco franchise system, told him that he didn't have to worry about the 70 percent clause if he found a customer outside of his territory. Carolina had customers outside of its territory, and it made sales efforts out of its territory. Carolina complains of Leasco's characterization of these sales and sales efforts as "persistent" and "repeated" but it doesn't matter, in our view, how they are characterized. The facts are that they were made, and that Leasco knew they were made. Despite this knowledge, Leasco never billed or collected the 70 percent royalty on outside sales. In addition, when Carolina defaulted on its obligations under the DNC, Leasco did not make a claim of default with respect to the 70 percent royalty clause.
 
 
 57
 Johnson's testimony suggested that the time and expense of outside solicitations rather than the territorial restrictions was the primary reason for not selling outside of Charlotte. Mummaw testified that he did not "actively" sell out of his territory. However, he also stated that the expense of long distance phone lines was eliminated with a local computer time-sharing company and that long distance charges were, in part, the reason that certain customers within Carolina's territory were not sold.
 
 
 58
 Carolina emphasizes Mummaw's testimony that Harris on two occasions told him not to worry about the 70 percent royalty "for now." But the fact is that there was never a "later." In short, Carolina had outside customers, it solicited outside customers, it never paid 70 percent and Leasco never asked for it.
 
 
 59
 Aubrey was the founder of the Datatron franchise in Louisville, Kentucky. Datatron had outside customers, Leasco knew this, and it never paid Leasco 70 percent of any revenues derived from extraterritorial sales.
 
 
 60
 Shortly after Datatron began its operations, in June, 1971, Leasco told it to go ahead and sell an outside prospect. In December, 1972, Datatron secured another outside customer. Leasco "waived" the 70 percent royalty with respect to this and three other potential outside customers in February, 1973.
 
 
 61
 Datatron argues that requiring a waiver shows the fact that they were damaged by the territorial restriction. We disagree. Datatron had already sold the outside account before its request to Leasco. Moreover, Datatron expected Leasco to waive the 70 percent requirement. There is no evidence that the discussion with Leasco caused a delay in the servicing of other accounts. Finally, there was no showing that Datatron had refused to service outside customers during the remainder of 1973, or, at least, until they stopped payment to Leasco in the summer of 1973.
 
 
 62
 We are also unpersuaded that the consideration for the waiver (payments of amounts due Leasco for 1972 to the extent possible and of amounts currently due) was a showing of fact of damage. It was no more than money due under Datatron's contract with Leasco. In any event, Datatron did not remain current on its payments to Leasco. Nevertheless, Leasco did not seek the 70 percent royalty.
 
 
 63
 Datatron also argues that fact of damage is shown because sales increased after the retention of counsel and it started selling outside of its territory. But this does not establish any loss as a result of the territorial restriction. There is no time specified for the alleged increases. There was no showing or attempt to show the reason for the increase. Cf. Copper Liquid Inc. v. Adolph Coors Co., supra, 506 F.2d at 954. This was particularly necessary where the alleged "restriction" had not been shown to limit outside sales previously. The fact that sales increased after Datatron began to sell outside has no bearing on fact of damage where it admitted that it began selling outside during the "restricted" period. We do not hold that events after a restriction is lifted by litigation may not be probative of fact of damage during the life of the restriction, but we recognize the close analysis which must be given to such evidence, cf. Knutson v. Daily Review, Inc., supra, 383 F.Supp. at 1381-84, and under these circumstances we hold that such a comparison especially one of this general testimonial nature is of little or no value.
 
 
 64
 Finally, it is of some moment that Datatron concentrated on developing the Louisville market because there was enough business or potential business there to keep its salesman busy. And, when Datatron defaulted on the DNC, Leasco did not claim a default with respect to the 70 percent royalty clause.
 
 
 65
 Friedman was Denver's founder and his testimony negates the existence of any injury to his franchise as a result of a territorial restriction. He did not expect the unfavorable portions of the DNC to be enforced, and they were not. Denver made outside sales and did not pay the 70 percent royalty. Leasco did not claim a default with respect to the 70 percent royalty clause in the DNC. Finally, Friedman also testified that he did not actively seek outside customers because of time not the 70 percent royalty.
 
 
 66
 Miami did not make any outside sales so the opportunity to charge the 70 percent royalty never arose. But Miami did solicit customers who were outside of its territory and there is no evidence that any customer was turned away as a result of the 70 percent clause.[36]
 
 
 67
 Wright, Miami's president, testified that the 70 percent clause was an inhibiting force in keeping Miami from going out of its territory. Such evidence would support a showing of a territorial restriction (as opposed to simply limitation). However, without more, cf. Kestenbaum v. Falstaff Brewing Corp., 5 Cir. 1975, 514 F.2d 690, 697, it does not prove legal injury "as a matter of fact and with a fair degree of certainty" especially in view of Miami's evidence of outside solicitations and the untapped nature of the Miami market, the potential for which had not been exhausted. Cf. Shumate & Co., Inc. v. National Association of Securities Dealers, Inc., 5 Cir. 1975, 509 F.2d 147, 153-55.
 
 
 68
 Recently in Pitchford v. Pepi Inc., supra, it was proven that defendants had an explicit territorial restriction that, if violated, would result in termination; plaintiff was denied three outside sales opportunities before the damage period because of the restriction; plaintiff was capable of making outside sales during the damage period; plaintiff unsuccessfully attempted to have his territory expanded over a period of several years and had plaintiff been permitted to compete in an expanded territory, it would have made additional sales.[37] Cf. Reed Bros. v. Monsanto, supra.
 
 
 69
 Here, there is no pre-damage period evidence of conduct. All franchisees made outside solicitations without reprisal and, in some cases, because of Leasco "leads." All but Miami had outside customers. None paid the 70 percent royalty on outside sales. While permission to sell outside could not legally have been required under Schwinn, it was received when requested by Datatron and Miami, the "conditions" of its receipt were not met by either, and the delay in receiving it produced no delay in service. No franchisee was terminated for other than legitimate reasons. Upon termination, no claim of default on any franchisee was made with respect to the 70 percent royalty clause. And there was insufficient evidence to show that the 70 percent royalty, rather than long distance phone charges or emphasis on development of local markets, materially contributed to reducing the number of outside sales that were made by Carolina, Datatron and Denver or prevented outside sales that would have been made by Miami.
 
 
 70
 We conclude, therefore, that the district court properly directed a verdict for Leasco on the issue of liability because each franchisee failed to submit sufficient evidence under Boeing to create a jury question on the existence of any injury caused by the territorial restriction.
 
 
 71
 Franchisees' contention of prejudice that they were not able to show fact of damage because of the district court's bifurcation order is more troubling.
 
 
 72
 Federal Rule of Civil Procedure 42(b) provides that a district court may order a separate trial of any issue "in furtherance of convenience or to avoid prejudice, when separate trials will be conducive to expedition and economy." We have approved such a bifurcation procedure on several occasions. However, we have cautioned that separation of issues is not the usual course that should be followed, Swofford v. B & W Inc., 5 Cir. 1964, 336 F.2d 406, 415,[38] and the "the issue to be tried must be so distinct and separable from the others that a trial of it alone may be had without injustice." Id.
 
 
 73
 Section 4 of the Clayton Act, 15 U.S.C.A. § 15, provides that " any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." As we have said, this section contemplates that not only must a violation be shown, but that the violation must result in or cause the legal injury alleged. " Liability" includes both violation and causation. But "damages" must be linked causally with "violation" before they are recoverable. This overlap is what prompted us to say in Terrell that "in a private antitrust suit there is no neat dividing line between the issues of liability and damages."[39] 494 F.2d at 21.
 
 
 74
 Because this "dividing line" is so difficult to draw, separate trials of "liability" and "damage" in antitrust cases[40] pursuant to Rule 42(b) must be approached with trepidation. The use of this trial procedure must be grounded upon a clear understanding between the court and counsel of the issue or issues involved in each phase and what proof will be required to pass from one phase to the next.[41] The trial court must be careful as well as flexible in its rulings on the admissibility of evidence under a bifurcation order. Simply because evidence contains numbers or amounts, for example, should not result in its exclusion in phase I. If causation or fact of damage cannot be shown without some reference to amount of damage, bifurcation should not prevent the reference.[42]
 
 
 75
 While the franchisees now claim prejudice resulting from the separation of the issues of liability and damages in the trial below they failed to object to the district court's bifurcation order. We will not take note of error raised for the first time on appeal, F.R.Civ.P. 46; Wright & Miller, Federal Practice and Procedure, § 2472, p. 455, except "where the interest of substantial justice is at stake." Edwards v. Sears, Roebuck and Co., 5 Cir. 1975, 512 F.2d 276, 286; see Hormel v. Helvering, 1941, 312 U.S. 552, 557, 61 S.Ct. 719, 85 L.Ed. 1037. For several reasons this is not such a case. Over three weeks intervened between the bifurcation of issues and the beginning of the trial. Franchisees had ample time to determine the boundaries of the bifurcation order, yet nothing was done.
 
 
 76
 Moreover, it appears that the franchisees, contrary to their present claim, understood the extent of their burden. For example, in an "Order of Proofs First Two Days of Trial" franchisees asked the court to rule that "counsel make no reference to the court's bifurcation order" or "whether the jury will be required to return for further service or not dependent upon their verdict on the issue of liability " and "(t)hat the amounts (as distinguished from the fact of ) damage not be mentioned in the presence of the jury, in either the Plaintiffs' case or the Defendant's counterclaim." (emphasis added).[43] In an "Order of Proofs Plaintiffs' Specification # 3" the district court was requested to admit certain deposition testimony on the ground that such excerpts "go the following issues":
 
 
 77
 5) Fact of damage.
 
 
 78
 8) Leasco's terminal maintenance-level-impact-effect-fact of damage.
 
 
 79
 10) The fact of customer losses.
 
 
 80
 In addition, it was stated that this proffered evidence "goes directly" to Leasco's argument of whether plaintiffs "suffered any actual damage by reason of defendant's alleged antitrust violations." There was reference to an exhibit which franchisees stated went to the issue of "fact of damage." There was a lengthy discussion of the element of "fact of damage" during the cross examination of Friedman, founder of the Denver franchise, midway through the plaintiffs' case. Counsel for Leasco sought to challenge Friedman's claim that Leasco's actions had cost him a loss in business value. Franchisees' counsel argued that the bifurcation order precluded this testimony. Counsel for Leasco responded:
 
 
 81
 If they have not been damaged, they have no claim, Your Honor. . . .
 
 
 82
 They are entitled to adduce testimony on the fact of damage just as we are entitled to prove to the jury there was no fact of damage.
 
 
 83
 In permitting cross examination the court noted that it was not in violation of the bifurcation order because "an essential element of the right of recovery is damage in both the fraud and antitrust claims." If franchisees were at all surprised by this statement no mention was made of it. If they then felt that it was incumbent upon them to submit proof that had not been offered they had over a month of trial time remaining to bolster their case.
 
 
 84
 In addition to the absence of an objection to the bifurcation order when it was first announced, franchisees' argument to the district court on the element of fact of damage in connection with Leasco's motion for a directed verdict was two-fold: there was a substantial basis in the record for a finding of fact of damage and fact of damage is not an element of liability under Coors. They did not argue that they had been prejudiced by the Court's rulings on admissibility of evidence.[44]
 
 
 85
 Finally, we conclude that the evidence excluded by the district court presumably because of the bifurcation order does not show any prejudice.
 
 
 86
 We now come to the tying claim raised by franchisees.IV.
 
 
 87
 The franchisees assert that they were required to lease the Response I hardware configuration from Leasco as a condition to their purchase of a Leasco franchise, and that this requirement constituted a tie-in illegal under Sherman § 1. The district court found that the hardware and franchise constituted a single product, that there was no proof of coercion on the part of Leasco, and that there was no proof of economic power by Leasco in the time-sharing industry. A directed verdict was thus entered in favor of Leasco on this claim.
 
 
 88
 In order to comprehend the basis of the franchisees' claims, some understanding of a computer's operation is necessary. The time-sharing system described as Response I can be broken into three components: the computer hardware, the operating system (systems software) and the applications programs (application software). The computer hardware, the actual physical machinery, consists of discrete parts: a central processing unit, the electronic device which performs the basic logical and arithmetic operations; various devices for storing information, such as magnetic tape units, magnetic discs, and magnetic drums; and terminal devices, for the output and input of information. These parts, when physically interconnected, comprise a unique computer hardware configuration.
 
 
 89
 The physical devices, the hardware, are themselves capable of following only the most rudimentary logical and arithmetic instructions known as machine language. In order to enable the system to perform sophisticated tasks, these basic operations must be combined. This is accomplished by the operating system, a complex computer program written in the basic machine language. In one aspect, the operating system is an interpreter, accepting instructions written in a more sophisticated language, and translating those instructions into the basic machine language instructions comprehendible by the computer hardware. In another aspect, the operating system acts as a controller, coordinating the activities of the various pieces of hardware with each other. Because of this latter task, the operating system is unique to the specific hardware configuration.
 
 
 90
 The final component of the computer system is the application software. These are computer programs designed to perform a specific function, generally usable by an individual without knowledge of the internal operations of the computer system. These programs are usually written in a sophisticated computer language, and then translated by the operating system into machine language instructions. In the case of Response I, the application software was designed to meet the general needs of small to medium sized businesses, performing such functions as inventory control, payroll, and the like.
 
 
 91
 The franchise agreement only provided the franchisee with the use of the Response I operating system and the Response I application software. The components necessary for the Response I system were detailed in the franchise agreement, but those components were not supplied under that agreement. The agreement stated that Leasco would lease the hardware to the franchisee upon terms set out in the agreement, but the agreement also made clear that the franchisee was free to procure the hardware from any other source.[45]
 
 
 92
 Even though the franchisees were free under the terms of the franchise agreement to procure the computer hardware from any available source, each franchisee signed an equipment lease for the required equipment with Leasco. They contend that they were coerced by Leasco into signing this lease rather than procuring the equipment elsewhere. Their argument is two-fold. First, they assert that they could have procured the necessary hardware capabilities through a process known as multiplexing, and that Leasco arbitrarily refused to let them multiplex. Second, they assert that although the individual hardware components were available from sources other than Leasco, it would be technologically impossible for them to configure or assemble the hardware so that it would function with the Leasco software. We find no evidence of coercion on the part of Leasco with respect to either claim, and thus affirm the directed verdict on the issue of tying.
 
 
 93
 A tying agreement is "an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product." Northern Pacific Ry. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. Such an agreement violates the Sherman Act whenever the party imposing the tie has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected. Id. at 6, 78 S.Ct. 514. As recognized by the Supreme Court, implicit in this formulation is the requirement that this requisite economic power actually be utilized to coerce the purchase of the tied product:
 
 
 94
 The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant "tying" product, resulting in economic harm to competition in the "tied" market. (emphasis added).
 
 
 95
 Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277. See also Southern Concrete Co. v. United States Steel Corp., 5 Cir. 1976, 535 F.2d 313.
 
 
 96
 We thus agree with the Third Circuit that, in order to establish an illegal tie, it is not enough to show that the seller has sufficient economic power and that two products were purchased together. In addition, it must be shown that the purchaser was coerced into purchasing an unwanted product:
 
 
 97
 We believe that coercion is implicit both logically and linguistically in the concept of leverage upon which the illegality of tying is premised: the seller with market power in one market uses that power as a "lever" to force acceptance of his product in another market. If the product in the second market would be accepted anyway, because of its own merit, then, of course, no leverage is involved; . . .
 
 
 98
 Ungar v. Dunkin' Donuts of America, Inc., 3 Cir. 1976, 531 F.2d 1211, 1218.
 
 
 99
 Our recognition of coercion as a necessary requirement in the proof of an illegal tie-in is in accord with similar holdings by other Courts of Appeal. Ungar v. Dunkin' Donuts of America, Inc., supra; Capital Temporaries, Inc. of Hartford v. Olsten Corp., 2 Cir. 1974, 506 F.2d 658; American Manufacturers Mutual Ins. Co. v. American Broadcasting-Paramount Mutual Theatres, Inc., 2 Cir. 1971, 446 F.2d 1131. Thus, in Capital Temporaries, the court found that although two services were sold as a package, there was no proof to suggest that the plaintiff ever objected to the package, that he was only interested in one of the two services, or that the second service was forced upon him. The absence of any evidence in this record mandated entry of summary judgment against the plaintiff. In American Manufacturers, plaintiff sued a TV network for allegedly forcing plaintiff to sponsor its product on both desirable and undesirable stations. The court found no illegal tie-in, noting:
 
 
 100
 (Plaintiff) did not persevere long enough with its ideal (TV) lineup to feel any economic pressure from ABC, and we cannot know whether ABC would ever have tried to bring any such pressure to bear.
 
 
 101
 446 F.2d at 1137.
 
 
 102
 Of course, in certain circumstances, the element of coercion can be established on the basis of a formal agreement. Thus, where one product is sold on the express contractual condition that the purchaser purchase supplies for that product in the future only from the seller, the purchaser's future course of action is limited by that contract, and coercion is found in the agreement itself. See, e. g., Advance Business Systems & Supply Co. v. SCM Corp., 4 Cir. 1969, 415 F.2d 55. But no such situation is before us. Here, the contractual arrangement left the franchisees free to procure the necessary hardware from any available source. Thus, in order to succeed on their claims, the franchisees must establish that their decision to lease the hardware from Leasco was not voluntary, but rather was coerced by Leasco.
 
 
 103
 The Response I system is an interactive time-sharing system. This means that users of the computer system, the customers of the franchisees, would not have to be located at the situs of the computer hardware in order to utilize its services. Rather, each customer would have its own computer terminal. In order to gain access to the computer, the customer would dial a telephone number assigned to a port, or input of the computer. The terminal would then be connected to the computer by use of the telephone line. Further, the operating system was designed so that it could process the input and output of more than one terminal simultaneously.[46] Under this system, the computer hardware would be located at the situs of the franchisee, and that hardware would have to be procured by him. The franchisees contend that they could have operated their Response I franchise without purchasing or leasing the required hardware by multiplexing into another Response I computer located elsewhere.
 
 
 104
 In a multiplexing scheme, the franchisee would not have his own hardware facility. Instead, the incoming telephone lines from the terminals would be input into a device known as a multiplexer, which would combine these lines into a single signal. This signal would then be sent out over a telephone line to a distant hardware facility, where it would then be broken down into the individual signals corresponding to each terminal, and processed by the computer hardware. Output from the computer to the terminals would be handled in the reverse manner. Under this scheme, the franchisees would only have to procure the multiplexing equipment, and access to another Response I computer system.[47] The franchisees argue that Leasco would not allow them to multiplex in order to sell Response I service through their franchisee. They say that the practical effect of this refusal was to force them to lease the hardware from Leasco, resulting in a tie between the hardware lease and the franchise.
 
 
 105
 With respect to this argument, the coercion requirement demands that they establish that their failure to procure multiplexing was not voluntary on their part, but rather that the decision not to multiplex was forced upon them by Leasco. Our careful review of the evidence bearing on this multiplexing claim establishes that the franchisees were never precluded from multiplexing by Leasco. At most, the evidence establishes that the decision was brought about by the persuasive selling techniques of Leasco, with that persuasion falling far short of coercion.
 
 
 106
 Although the trial of plaintiff's case took four months and covers 6000 pages of transcript, the testimony relating to the multiplexing claim is so scanty that we set it out in full. Mummaw, a principal of the Carolina franchise, asked Harris, a Leasco Response officer, whether it could multiplex until it had enough revenue to justify the use of an in-house computer. Mummaw testified that Harris' response was:
 
 
 107
 "You are going to expand and grow so fast you might as well install the equipment now."
 
 
 108
 The testimony of Wright, principal of the Miami franchise, is no stronger: Wright asked Shrager, a Leasco principal, whether he could multiplex. As stated by Wright,
 
 
 109
 He (Shrager) told me we were going to be so successful that we would not need to multiplex in the Miami area. He said we would be better off with the Response I computer there.
 
 
 110
 The testimony of Aubrey, principal of Datatron, though perhaps somewhat stronger, is in substance no different. It is testimony of persuasion, not coercion:
 
 
 111
 Q: Did you ever ask for permission to multiplex through one of their centers that was closer by?
 
 
 112
 A: (Aubrey) Yes, when we first went in business, I asked Mr. Harris if I could multiplex into a Response I computer that would be closely located to Louisville . . . and he explained to me that the concept of the data network centers was to have a local company and that this would not be permissible and he said this is really for your benefit it is to the advantage of your company not to do that, and so we did not.
 
 
 113
 Finally, plaintiffs concede that there was never any discussion of multiplexing with regard to the Denver franchise.
 
 
 114
 Although, in some instances, the line between coercion and persuasion might not be clear, in which circumstance the issue should be left for the finder of fact to resolve, the evidence before us does not provide such an instance. We conclude that, under the standard of Boeing, supra, there is no substantial evidence that any of the franchisees were prohibited from utilizing multiplexing through the coercive acts of Leasco.
 
 
 115
 Next, the franchisees claim that the two products involved, the franchise and the hardware, were coercively tied through the technology involved since the systems software, the operating system, was only compatible with the hardware configuration designed by Leasco, the franchisees necessarily had to purchase the hardware along with the software. We fail to find any evidentiary support for this contention.
 
 
 116
 First, there is no evidence in the record that the individual components of the hardware configuration could not have been purchased from sources other than Leasco, and that when so purchased, they could not have been assembled into the same hardware configuration leased by Leasco.[48] The franchisees seem to assert that this avenue was not open to them. They argue that even if they did assemble the components into the required hardware configuration, they could not operate the system because Leasco withheld from them the Response I operating system. This is completely without evidentiary support. Not only does the franchise agreement provide that Leasco must furnish the operating software,[49] but there is no evidence at all that they failed to comply with this provision, or would not have complied with it had the franchisees not leased the hardware from Leasco.
 
 
 117
 Second, the franchisees did not obtain the computer hardware elsewhere not because it was impossible to do so, but rather, in their business judgment, it made more sense to procure it from Leasco. For example, Aubrey, principal of Datatron, testified that he could have purchased the hardware from Hewlett-Packard, manufacturer of some of the components, but he did not do so because, in his judgment, "it would not have made good business sense." We find no evidence contrary to this assertion.
 
 
 118
 These two points lead us to the conclusion that, as with the multiplexing claim, there is no proof that the franchisees were coerced into accepting the hardware lease along with the franchise. We can find no proof that any of the franchisees desired to purchase or lease the hardware from someone other than Leasco, or conversely, that any of them ever envisioned the purchase of the franchise without the lease of the hardware. As far as we can discern, the decision of the franchisees to sign the hardware lease was completely voluntary on their part, motivated by business reasons, not by coercion on the part of Leasco.
 
 
 119
 Even if we accept the argument of the franchisees that they could not obtain the hardware from others because duplication of the configuration was dependent upon knowledge of unique proprietary information available only from Leasco,[50] an argument which we find without evidentiary support, we still find no illegal tie-in. In some instances, two products might be illegally tied through the technological relationship between them. If, for example, the systems software was designed to only be compatible with a specific hardware configuration, and that specific hardware configuration, because it is based on information held only by the seller, is only available from that seller, then a violation might be found. But such a violation must be limited to those instances where the technological factor tying the hardware to the software has been designed for the purpose of tying the products, rather than to achieve some technologically beneficial result. Any other conclusion would enmesh the courts in a technical inquiry into the justifiability of product innovations. See Telex v. International Business Machines Corp., N.D.Okla.1973, 367 F.Supp. 258, 347, reversed on other grounds, 10 Cir. 1975, 510 F.2d 894. Here, not only is there no proof that the hardware configuration was only available from the seller because of proprietary information withheld by him,[51] but in addition there is no evidence that the interrelationship of the software system to the hardware was for the purpose of illegally tying the two.
 
 
 120
 The basic hardware, as purchased from Hewlett-Packard by Leasco, was inadequate, mainly in memory capacity, to support a time-sharing environment. Changes were made, both in hardware, through the interface of the Control Data disks and other devices to the central processing unit for additional memory capacity, and in software, through the refinement of the original Hewlett-Packard operating system. Such changes were integrally related and necessary for the development of the complete Response I system. There is no evidence that they were made for the purpose of tying the hardware to the software.[52]
 
 
 121
 Since we find no evidence of coercion on the part of Leasco, either with regard to the multiplexing claim or the hardware claim of the franchisees, we find it unnecessary to reach the other grounds set out by the district court as the basis for the directed verdict on this issue.
 
 In summary, we hold:
 
 122
 1. Under Schwinn, the district court erred in directing a verdict for Leasco on the existence of an illegal vertical restraint.
 
 
 123
 2. However, the district court properly held that franchisees failed to introduce sufficient evidence that they were injured as a result of the alleged restraint. Therefore, the district court's judgment on the territorial restriction claim is affirmed.
 
 
 124
 3. The district court properly held that the franchisees failed to introduce sufficient evidence to establish that their decision either not to multiplex or to purchase computer hardware from Leasco was coerced by Leasco. Therefore, the directed verdict on the tying claim was proper.
 
 
 125
 AFFIRMED.
 
 
 
 [1]
 Response Service is defined in the agreement as (a) Response I BASIC interactive time sharing via a Response I computer configuration centering around a Hewlett/Packard computer located on franchisee's premises; (b) Leasco's library of Response I computer time-sharing programs including application packages and (c) Leasco's technical operations and sales manuals, forms of incentive and compensation plans, branch operating manuals, and accounting and legal forms
 
 
 [2]
 Specifically, Paragraph 10 of the DNC provides:
 "(b) (Franchisee) shall pay to Leasco an amount equal to fifteen (15%) percent of (franchisee's) monthly gross sales . . . during each month of the term hereof.
 (c) (Franchisee) shall pay to Leasco a commission at the rate of seventy (70%) percent of (franchisee's) monthly gross sales attributable to sales of (franchisee's) Response Service to third parties, which third parties are located outside of (franchisee's) Area."
 
 
 [3]
 A description of the relationship between the hardware and software components of the computer system appears in Part IV, infra
 
 
 [4]
 See footnote 1, supra
 
 
 [5]
 In the Carolina and Datatron DNC's, Exhibit B listed the following equipment: a Hewlett/Packard Model 2000A central processing unit, power supply, memory extender, tape reader, teleprinter, drum memory, magnetic tape unit, and disk controller. Added to these in the Miami and Denver leases were a disk drive, disk packs, terminals, couplers, Ohio Brass cables, and data communications cables
 
 
 [6]
 The rental payment schedule was the same for the four franchisees: $2,500 per month for the first 12 months; $4,206 per month for the next 12 months, and $5,252 per month for the final 36 months. In addition, each franchisee bore the risk of loss of the equipment and agreed to carry insurance on the equipment at the cost of $500 per year
 
 
 [7]
 The antitrust laws vest exclusive jurisdiction in the federal courts, 15 U.S.C.A. § 4. Therefore, an antitrust defense could not have been raised by Carolina in Leasco's state action
 
 
 [8]
 The complaint also alleged various fraud claims and a breach of contract
 
 
 [9]
 After the filing of the Carolina and Datatron complaints, the district court issued a preliminary injunction against Leasco to prevent it from prosecuting the state court case against Carolina and from taking any action which would result in the termination of Datatron's business. This Court reversed that judgment. Response of Carolina v. Leasco Response, Inc., 5 Cir. 1974, 498 F.2d 314
 
 
 [10]
 As mentioned earlier, franchisees never plead the issue of tying. They attempted to do so in an amended complaint filed April 11, 1974, but the district court refused leave to amend on June 14, 1974. In the pre-trial stipulation, Leasco stated its objection to treating tying as an issue at trial since it had not been plead. The district court permitted trial of the tying issue, however, because of the broad discovery conducted by both sides and because the alleged prejudice to Leasco did not rise to the level described in Hodgson v. Colonnades, 5 Cir. 1973, 472 F.2d 42, 48. Leasco does not contend that this ruling was erroneous
 
 
 [11]
 It appears that the district court took this action sua sponte, which is not impermissible, F.R.Civ.P. 42(b)
 
 
 [12]
 Franchisees voluntarily withdrew their breach of contract claims at the end of their case
 
 
 [13]
 Leasco had counterclaimed for unpaid royalties from franchisees and the jury also found in its favor in this respect. Franchisees have not appealed from the judgment entered upon the jury verdicts on the fraud claim and Leasco's counterclaim
 
 
 [14]
 Among them are included price-fixing, United States v. Trenton Potteries, 1927, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; tying arrangements, International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; division of markets, Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; group boycotts, Fashion Originators' Guild v. FTC, 1941, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949, and resale price maintenance, United States v. Parke, Davis and Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505
 
 
 [15]
 For a more detailed description of the Schwinn distribution policy, see Pollock, Alternative Distribution Methods After Schwinn, 63 Nw.U.L.Rev. 595, 596-97
 
 
 [16]
 This approach to determining the existence of the jurisdictional element of a "contract, combination, or conspiracy" was also used in United States v. Parke, Davis & Co., 1960, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505. Parke, Davis had announced a resale price maintenance policy and stated that it was Parke, Davis' continuing policy to deal with drug wholesalers who observed the schedule of prices. Had it done no more, United States v. Colgate, 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992, would have prevented the finding of an "agreement" necessary to trigger the Sherman Act. But it used the refusal to deal policy "to elicit" wholesalers' willingness to deny products to retailers who refused to adhere to the price policy thereby creating "a combination with the retailers and the wholesalers to maintain retail prices." 362 U.S. at 45, 80 S.Ct. at 512. Threats of termination secured the retailers' acquiescence in the suggested prices. The wholesalers cooperated by terminating the price-cutting retailers. Each resulted in separate "concerted action induced by the manufacturer" combinations violative of the Sherman Act. Cf. FTC v. Beech-Nut Packing Co., 1921, 257 U.S. 441, 455, 42 S.Ct. 150, 66 L.Ed. 307; United States v. Schrader's Son, 1920, 252 U.S 85, 99-100, 40 S.Ct. 251, 64 L.Ed. 471
 
 
 [17]
 See footnote 16, supra
 
 
 [18]
 Janel Sales has sprouted offspring, see, e. g. United States v. Empire Gas, W.D.Mo.1975, 393 F.Supp. 903, 911 ("unenforced agreements, even when proven, do not violate the Sherman Act"), cf. Stan Togut Corp. v. Hobart Mfg. Co., S.D.N.Y.1974, 398 F.Supp. 1323, 1326-27
 
 
 [19]
 The court actually referred to the contract provision as describing no more than "a primary marketing territory." The distinction may not be a gossamer one: a contract which authorizes one to sell in the described territory may, depending upon the circumstances, give rise to different inferences than one which requires use of one's best efforts to sell in the described territory. This appears to be the basis for Judge Murrah's dissent, 472 F.2d at 641-42
 
 
 [20]
 The reliance on Janel Sales is misplaced. Janel Sales involved an express contractual restriction whereas the Febco distributorship agreement created an APR, not the equivalent of an express restriction. The citation of Janel Sales is even more curious because the court distinguished Schwinn saying: "Our case is different from Schwinn. We have no explicit contract restriction." 472 F.2d at 639. Aside from the fact that there was no explicit contractual restriction in Schwinn, if this was the basis for the distinction, then Janel Sales should have been similarly distinguishable
 
 
 [21]
 Plaintiff also sued in the capacity of a terminated dealer. But the court held that his poor sales record in his area of primary responsibility justified his termination, 525 F.2d at 494
 
 
 [22]
 See footnote 20, supra
 
 
 [23]
 The court in Schwinn "observed" that the facts did not come within
 "the specific illustrations which the Court in White Motor articulated as possible factors relevant to a showing that the challenged vertical restraint is sheltered by the rule of reason because it is not anticompetitive. Schwinn was not a newcomer, seeking to break into or stay in the bicycle business. It was not a 'failing company.' " 388 U.S. at 374, 87 S.Ct. at 1863.
 We have recognized that this language may give rise to exceptions to the Schwinn per se rule. Eastex Aviation, Inc. v. Sperry & Hutchinson, supra, 522 F.2d at 1307, fn. 13; Copper Liquor, Inc. v. Adolph Coors Co., supra, 506 F.2d at 943; see also, GTE Sylvania, Inc. v. Continental T.V., Inc., 9 Cir. 1976, 537 F.2d 980, 1004, fn. 41. Cf. Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 330, 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. Jerrold Electronics Corp., W.D.Pa.1960, 187 F.Supp. 545, 560-61, aff'd, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806. Rather than outline exceptions (other than the "failing company" and "new entrant" ones) to Schwinn found by other courts, we simply note the literature on the subject. Comment, Territorial Restrictions under the Sherman Act: Confusion in the Aftermath of Schwinn, 47 Miss.L.R. 239, 250-57 (1976); Izard, Staton and Ross, Of Bicycles and Beer: Vertical Territorial and Customer Restraints from Schwinn to Coors, 26 Mercer L.R. 507, 512-24 (1975); Note, Vertical Territorial and Customer Restrictions in the Franchising Industry, 10 Col.J. of Law. and Soc.Probs. 497, 505-11 (1974); Note, Vertical Territorial and Customer Restrictions under the Sherman Act: Decisions since United States v. Arnold, Schwinn & Co., 22 J. of Pub.L. 483, 488-97 (1973).
 
 
 [24]
 See also Pitchford v. Pepi, Inc., supra. This is not to say that the lack of enforcement is not relevant. To the contrary, it will play a powerful part in the proof of fact of damage or causation required under the antitrust laws before treble damages may be recovered, see Part III, infra
 
 
 [25]
 But see TAN 27-29 and fn. 30, infra, and Reed Bros. v. Monsanto, supra. Where neither a restriction nor a limitation is expressed in the contract, the firm and resolute approach would be available. See Noble v. McClatchy Newspapers, 9 Cir. 1975, 533 F.2d 1081, 1089-90; Beverage Distributors, Inc. v. Olympia Brewing Co., supra, World of Sleep v. Stearns & Foster Co., supra. Cf. Knutson v. Daily Review, N.D.Cal.1974, 383 F.Supp. 1346, 1368 (contract was "ambiguous" with respect to the existence of a limitation)
 
 
 [26]
 The lack of enforcement of the 70 percent royalty on outside area sales, however, is quite relevant to a showing of damage, Part III, infra
 
 
 [27]
 Cf. Hobart Brothers Co. v. Gilliland Inc., 5 Cir. 1973, 471 F.2d 894, 900. Whether Leasco has parted with dominion, title and risk of loss in this context is not seriously questioned or else it, too, would be part of the inquiry on a motion for directed verdict
 
 
 [28]
 We resist the temptation to hold that the contract provisions on their face amount to a per se violation. The defendant should be given the opportunity to prove that the disparity does not result in a restraint of trade, rather than having us determine how much is too much. When the question is one of "degree" rather that one of "kind," as here, the trier of fact is the most appropriate judge of the legality of the restraint
 
 
 [29]
 Cf. Knutson v. Daily Review, supra, 383 F.Supp. at 1368-69 where the contract was ambiguous with respect to the existence of a restriction or a limitation and the court found the evidence insufficient to establish an illegal restriction. See also Noble v. McClatchy Newspapers, supra, 533 F.2d at 1089-90
 
 
 [30]
 This evidence was proffered by Datatron since the district court refused to admit it. In our view, the evidence was admissible to show the effect of the 70 percent royalty on outside sales going to the question of converting territorial limitations into territorial restrictions
 
 
 [31]
 Franchisees have cited to us no case supporting this proposition, and we have found none
 
 
 [32]
 Haverhill demonstrates the procedural and proof problems in a bifurcated antitrust trial on liability and damages, see infra, but it, nevertheless, makes clear that "liability" includes fact of damage
 
 
 [33]
 In Wall I, the district court limited the issues of the first phase of the non-jury trial "to alleged violations by defendants of Section 1 of the Sherman Act . . . and impact on the dealer plaintiffs." 326 F.Supp. at 296. In Wall II, the district court properly referred to phase I as the "trial on liability" wherein it had found a conspiracy to stabilize prices in the gypsum wallboard market which had a " 'direct impact upon the plaintiffs, each of whom suffered damage to their respective businesses and properties in an as yet undetermined amount'." 357 F.Supp. at 835. Though "impact" was found in phase I, the district court stated that before it could make a just and reasonable estimate of damages, "plaintiffs must establish the existence of some causal connection between the defendants' unlawful acts and plaintiffs' injuries." Id. A causal link was required to prove "liability" in phase I even though that link was not strong enough to embrace all of the forms of injury claimed
 
 
 [34]
 In our view, "impact," "fact of damage" and "causal link" mean the same things
 
 
 [35]
 See Timberlake, "The Legal Injury Requirements and Proof of Damages in Treble Damage Actions under the Antitrust Laws," 30 Geo.Wash.L.Rev. 231 (1961); Knutson v. Daily Review, Inc., supra, 383 F.Supp. at 1376-88; and the many cases cited in the text and notes in Terrell, supra, 494 F.2d at 20
 
 
 [36]
 A waiver was also given Miami but the customer involved was never serviced
 
 
 [37]
 It was also shown that despite the extra transaction costs in relation to outside competitors, Pitchford would have made a profit on outside sales. This last point goes to computing the amount of damages on which the court remanded. In this respect, see Perma Life Mufflers, Inc. v. International Parts Corp., 1968, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982; Kestenbaum v. Falstaff Brewing Corp., 5 Cir. 1975, 514 F.2d 690, 695; Areeda, Antitrust Violations Without Damage Recoveries, 89 Harv.L.R. 1127, 1136-38 (1976)
 
 
 [38]
 See Wright & Miller, Federal Practice and Procedure, § 2388; 5 Moore's Federal Practice, P 42.03, p. 42-25
 
 
 [39]
 See Haverhill Gazette Co. v. Union Leader, supra, 333 F.2d at 802: "In a private antitrust action liability and damages are not separate." Cf. Areeda, Antitrust Violations Without Damage Recoveries, supra, 89 Harv.L.R. at 1139: "an antitrust damage assessment cannot be divorced from thoughtful attention to the rationale for liability and the internal logic of the liability holding."
 
 
 [40]
 As an illustration of the juggling of violation, impact and damages which has occurred in the two phases of a bifurcated antitrust trial, see Knutson v. Daily Review, supra, 383 F.Supp. at 1354-55, bifurcated between "violation" and "impact and damages" and Wall Products I and II, supra, fn. 33
 
 
 [41]
 See In Re Master Key Litigation, D.Conn.1975, 70 F.R.D. 23, 20 F.R.Serv.2d, 619, 624, appeal dismissed, 2 Cir. 1975, 528 F.2d 5. Cf. LoCicero v. Humble Oil & Refining Co., E.D.La.1971, 14 F.R.Serv.2d 1305
 
 
 [42]
 For example, lost profits from outside sales is one injury claimed by those subjected to territorial restrictions. To show that profits have been lost, as opposed to how much, if any, have been lost, would seem to require a showing (1) of the capability of making outside sales, and (2) of the sales that reasonably would have been made but for the restriction. See Pitchford v. Pepi, Inc., supra, 531 F.2d at 105; Kestenbaum v. Falstaff Brewing Corp., supra, 514 F.2d at 697. The fact that "numbers" may be used in (2) would not preclude admission
 
 
 [43]
 This request which was granted weakens considerably franchisees' claim that the district court was unduly harsh in its evidentiary ruling with respect to the bifurcation order's boundaries, see infra
 
 
 [44]
 There was reference to two evidentiary rulings. Counsel for franchisees stated that "we tried to prove time and again who the customers were that we lost and the reasons for the loss. The Court precluded that." In our review of the record, and in our consideration of the briefs and the oral argument, we have found no factual basis for this statement. It was also stated that proof of what happened after "we ignored the territorial provisions" was excluded. Such a comparison has no probative weight where the provisions had been ignored "during" their "existence." There was not even an oblique reference to the possible prejudicial effects of these rulings or any others in the context of bifurcation. Counsel stated that he brought them up "not to argue bifurcation" but to show how "some evidence was properly excluded which, if in the record, would support" a showing of damages
 
 
 [45]
 The pertinent portion of the franchise agreements provides:
 
 
 [4]
 Response Equipment. Leasco, in order to assist Owner and Operator in establishing its Response Service Business and to fully exploit the rights granted herein is willing to lease to them the items of equipment (hereinafter called the "Response Equipment") listed in Exhibit B attached hereto, and if they should accept Leasco's offer to lease such equipment, such lease shall be in accordance with the terms and conditions of the Lease Agreement attached hereto as Exhibit B. Leasco will arrange for the set up and installation of the Response Equipment in the Operator's premises without charge to Operator. All other equipment or items necessary to exploit the rights granted above shall be procured by the Operator at its own cost and expense including, but not limited to, tapes, discs, forms, data sets, terminal equipment, and telephone lines. Leasco may make such other equipment or items available for sale or lease to Operator from time to time under contract separate and distinct from this Agreement at mutually agreeable prices, (which shall not exceed Leasco's published retail prices, if any) but Operator shall be free to obtain such equipment or items, or their equivalent, from other sources
 
 
 [46]
 The Response I system as initially designed had ports for 16 terminals, and thus could process sixteen customers at the same time
 
 
 [47]
 In this regard, paragraph 10(e) of the franchise agreement provided the franchisees could purchase Response I computer time from Leasco at 70 percent of Leasco's standard rental rates, provided that other costs for telephone lines, multiplexers, data set and terminals would be borne by the franchisee
 
 
 [48]
 Of course, a different situation might be presented if Leasco refused to provide the technical information necessary to assemble the components into the required configuration. But there is no evidence in the record that such information was ever requested, or, if requested, would have been refused by Leasco
 
 
 [49]
 The franchise agreements provide that Leasco shall furnish the franchisee with Response Service, which includes those computer programs comprising the applications packages and the Response I Basic Computer System Software. See fn. 2, supra
 
 
 [50]
 If the hardware configuration was so complex that the franchisees could not duplicate it even if they had all necessary proprietary information, a position which they vaguely assert, we still fail to see any Sherman § 1 violation. In order for a tie to exist, the seller must be using its economic power in the tying product to "restrain free competition in the market for the tied product," Northern Pacific Ry. Co. v. United States, 1958, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545. But if it was not possible to duplicate the hardware system, then there was no actual or potential competition to Leasco with respect to that hardware which is restrained by the alleged tie. See Coniglio v. Highwood Services, Inc., 2 Cir. 1974, 495 F.2d 1286
 
 
 [51]
 See footnote 48, supra
 
 
 [52]
 The franchisees point to evidence which establishes that part of Leasco's intent in setting up the franchise operation was to find an outlet for excess hardware which it owned. However, the relationship between the hardware and software in the Response I system was established at least one year before the first franchise was sold, with the Response I system first being utilized by Leasco-owned branches. There is no evidence that the technological relationship between the hardware and software systems was created for other than technological benefits. The intent of Leasco with regard to the franchise operations does not bear on this point